# EXHIBIT C

1 UNITED STATES DISTRICT COURT

 EASTERN DISTRICT OF NEW YORK

2 -----------------------------------------X

 TAKISHA REID,

3

             PLAINTIFF,

4

     -against-  Index No.:

5          20-CV-3926 (FB)(PK)

6 THE CITY OF NEW YORK POLICE DEPARTMENT, THE CITY OF NEW

 YORK, NYPD OFFICER GREGORY HOWARD, JOHN DOE AND JANE DOES

7 1-5,

8           DEFENDANTS.

 -----------------------------------------X

9

10       DATE: September 28, 2022

11       TIME: 11:35 A.M.

12

13

14      EXAMINATION BEFORE TRIAL of the Plaintiff,

15 TAKISHA REID, taken by the Defendants, pursuant to an

16 Order, held at the above date and time, before Alexandra

17 Glasgow, a Notary Public of the State of New York.

18

19

20

21

22

23

24

25

```
 1    1    A P P E A R A N C E S:
 2    2
 3    3    PAWAR LAW GROUP, PC
                    Attorneys for the Plaintiff
 4    4         TAKISHA REID
                    20 Vesey Street, Suite 1410
 5    5         New York, New York 10007
                    BY: VIKRANT PAWAR, ESQ.
 6    6              DEVON RADLIN, ESQ.
 7    7    HON. SYLVIA O. HINDS-RADIX
           CORPORATION COUNSEL
 8    8    NEW YORK CITY LAW DEPARTMENT
                    Attorneys for the Defendant
 9    9         THE CITY OF NEW YORK POLICE DEPARTMENT, THE CITY OF
                    NEW YORK
10   10         100 Church Street
                    New York, New York 10007
11   11         BY: JEFFREY F. FRANK, ESQ.
           File #: 2020-035235
12   12         Control #: 22-2455
13   13    LAW OFFICES OF PETER W. TILL
                    Attorneys for the Defendant
14   14         NYPD OFFICER GREGORY HOWARD
                    105 Morris Avenue, Suite 201
15   15         Springfield, New Jersey 07081
                    BY: LOUIS J. KELEHER, ESQ.
16   16
17   17    ALSO PRESENT:
                    Gregory Howard
18   18
                         *         *         *
19   19
20   20
21   21
22   22
23   23
24   24
25   25
```

1          221. UNIFORM RULES FOR THE
                 CONDUCT OF DEPOSITIONS
2     221.1 Objections at Depositions
      (a) Objections in general. No objections shall be made at a
3     deposition except those which, pursuant to subdivision (b),
      (c) or (d) of Rule 3115 of the Civil Practice Law and
4     Rules, would be waived if not interposed, and except in
      compliance with subdivision (e) of such rule.   All
5     objections made at a deposition shall be noted by the
      officer before whom the deposition is taken, and the answer
6     shall be given and the deposition shall proceed subject to
      the objections and to the right of a person to apply for
7     appropriate relief pursuant to Article 31 of the CPLR.
      (b) Speaking objections restricted.  Every objection raised
8     during a deposition shall be stated succinctly and framed
      so as not to suggest an answer to the deponent and, at the
9     request of the questioning attorney, shall include a clear
      statement as to any defect in form or other basis of error
10    or irregularity.   Except to the extent permitted by CPLR
      Rule 3115 or by this rule, during the course of the
11    examination persons in attendance shall not make statements
      or comments that interfere with the questioning.
12    221.2 Refusal to answer when objection is made. A deponent
      shall answer all questions at a deposition, except (i) to
13    preserve a privilege or right of confidentiality, (ii) to
      enforce a limitation set forth in an order of the court, or
14    (iii) when the question is plainly improper and would, if
      answered, cause significant prejudice to any person.   An
15    attorney shall not direct a deponent not to answer except
      as provided in CPLR Rule 3115 or this subdivision.   Any
16    refusal to answer or direction not to answer shall be
      accompanied by a succinct and clear statement of the basis
17    therefor.   If the deponent does not answer a question, the
      examining party shall have the right to complete the
18    remainder of the deposition.
19
20
21
22
23
24
25

1          221. UNIFORM RULES FOR THE
                CONDUCT OF DEPOSITIONS
2

221.3 Communication with the deponent
3               An attorney shall not interrupt the deposition
for the purpose of communicating with the deponent unless
4    all parties consent or the communication is made for the
purpose of determining whether the question should not be
5    answered on the grounds set forth in section 221.2 of these
rules and, in such event, the reason for the communication
6    shall be stated for the record succinctly and clearly.
7

                IT IS FURTHER STIPULATED AND AGREED that the
8    transcript may be signed before any Notary Public with the
same force and effect as if signed before a clerk or a
9    Judge of the court.
10

                IT IS FURTHER STIPULATED AND AGREED that the
11   examination before trial may be utilized for all purposes
as provided by the CPLR.
12

13               IT IS FURTHER STIPULATED AND AGREED that all
rights provided to all parties by the CPLR cannot be deemed
14   waived and the appropriate sections of the CPLR shall be
controlling with respect hereto.
15

16               IT IS FURTHER STIPULATED AND AGREED by and
between the attorneys for the respective parties hereto
17   that a copy of this examination shall be furnished, without
charge, to the attorneys representing the witness
18   testifying herein.
19
20
21
22
23
24
25

1    Howard also offering your friend a role as a confidential

2    informant?

3        A.      Oh, no, he didn't want her.  He didn't want Tania

4    Brown.  He didn't want her.  He wanted me.  He said we

5    could split the money.

6        Q.      Who could split the money?

7        A.      Me and Tania but he didn't want Tania to be an

8    informant for him.  He wanted me.

9        Q.      And so you said you started working for Detective

10   Howard in October of 2017, your first case was against

11   Lawrence Brown, how did you guys usually communicate, you

12   and Detective Howard?

13       A.      His personal cellphone number that he gave me.

14       Q.      Were those communications phone calls, text

15   messages?

16       A.      They were both.

17       Q.      Did you guys ever communicate through social

18   media?

19       A.      We didn't start -- he didn't start communicating

20   with me through Messenger until June of 2018.

21       Q.      And when you say Messenger, what are you

22   referring to?

23       A.      Just like little things on Messenger but it was

24   pertaining about one particular case.

25       Q.      Maybe I'm not clear, I'm confused, what's

1 He grabbed me and kissed me. I wasn't expecting it.

2 Q. Did you tell the IAB that the sex you had was

3 consensual?

4 A. I told them it was consensual because I didn't

5 fight him off. I also told them I froze. I didn't fight

6 him off because I froze and I was scared, and it all

7 happened so fast.

8 Q. I want to be clear. You didn't tell IAB that

9 Detective Howard raped you, correct?

10 A. No.

11 Q. You told IAB the sex was consensual twice; is

12 that correct?

13 A. Yes.

14 MS. RADLIN: Just so the record is clear,

15 you mean two different times of having sex or two

16 different times speaking to IAB? If we could

17 clarify that.

18 MR. KELEHER: One time speaking IAB. She

19 told IAB that she had sex twice consensually with

20 Detective Howard.

21 THE WITNESS: But can I add to that?

22 MR. KELEHER: No.

23 Q. Do you remember your session with Jewish Family

24 Services on January 8th of 2020?

25 A. You have to be more specific.

1    been prescribed any drugs in that regard to help you with

2    that?

3         A.    You mean medication?

4         Q.    Yes, prescription medication from a doctor.

5         A.    Yes.  The medication that I previously told you,

6    Trazodone, Wellbutrin, Lexapro, Lamictal.

7         Q.    Those are all prescribed for depression, anxiety

8    and memory loss?

9         A.    Memory loss, post traumatic stress and trauma,

10   and depression, major depression.

11        Q.    Thank you.  I'm going to go back to your

12   relationship with Greg Howard real quick.

13              When was the first time you had a sexual

14   relationship with Greg Howard?

15        A.    There's noise in the background.  Can you say

16   that again.

17        Q.    When was the first time you had a sexual

18   relationship with Greg Howard, was that the April incident

19   you just described?

20        A.    April, April 2018.

21        Q.    And how long did your sexual relationship last,

22   until January of 2019?

23        A.    The sexual encounter only happened -- well,

24   actually, it was three times.  Two was intimate, and the

25   third one was where he fingered me in his car.

1    Q.    So the first instance was in April, which you

2    previously described, correct?

3    A.    Yes.

4    Q.    What was the second instance?

5    A.    The second incident was May 25th of 2018.  It was

6    in front of my house.

7    Q.    What happened?

8    A.    Howie came to pick me up.  He brought me -- when

9    he came to pick me up, I noticed he didn't have any boxer

10   shorts on.  He just had a wife beater and shorts.  He had

11   been drinking.  He had been drinking all night.  He came

12   with a cup of Hennessy, and he took me to my house and

13   that's when the second encounter happened.  He basically

14   put my head down so I could suck his dick.

15   Q.    What car was Detective Howard driving when he

16   came to your house?

17   A.    His car, a black car.

18   Q.    What type of car?

19   A.    I don't know the model.

20   Q.    Was anyone else present at your home when this

21   occurred?

22   A.    Yes, my son, and my son's baby mother.

23   Q.    How old is your son?

24   A.    He's 30 now.

25   Q.    What time of day was this?

1     Q.     Did you tell that to the IAB?

2     A.     I sure did.  I sure did, and to CCRB too, that's

3   why they referred my case to the DA's office because I told

4   him I was a confidential informant for an NYPD detective

5   and they referred my case to CCRB.  CCRB referred my case

6   to IAB.  Somehow the DA in Staten Island got my case.  She

7   was going after Howie but I was scared.  I was scared

8   because he had outed me and threatened me so much.  I was

9   scared to talk to her.

10    Q.     When did Detective Howard out you as a

11  confidential informant?

12    A.     After I told him it was me that turned him in.

13  Every time I met with Howie, he would threaten to out me.

14    Q.     I'm going to ask the question again.

15          How specifically did Detective Howard out you as

16  a confidential informant?  What did he do specifically?

17    A.     He just would hold that over my head.  I don't

18  know if he actually went to people.  That part, I don't

19  know but all I know is every time we spoke, and he would

20  get upset because it was me that outed him to IAB, he would

21  always tell me how would you like it if I told people it

22  was you that gave them to me.  He said it more than once.

23    Q.     Again, but you have no proof or any knowledge of

24  Detective Howard ever doing that, correct?

25          MS. RADLIN:  Objection to form.

1    A.    That is correct.  I have no proof but I can go

2    off the threats that he made to me.

3    Q.    And to date, are you aware of anyone approaching

4    you and asking if you're a confidential informant?

5    A.    Yes, in Elizabeth, New Jersey when my story got

6    out, I was threatened.  I had people threatening to kill

7    me.  I made a police report and everything, yes.  When my

8    story got out, yes, people came up to me are you a rat,

9    snitch, yes.  My life is in jeopardy.

10   Q.    When you say your story came out, is that when

11   you sat for the interview with the New York Daily News?

12   A.    Yes.

13   Q.    That's when you announced to the world that you

14   were a confidential informant, correct?

15            MS. RADLIN:  Objection to form.

16   A.    Yes.

17   Q.    So you, not Detective Howard, was the one who

18   told everyone through this article that you were a

19   confidential informant; is that correct?

20            MS. RADLIN:  Objection to form.

21   Q.    You can answer.

22   A.    I'm going to answer.  Yes.

23   Q.    Detective Howard didn't write this article, did

24   he?

25   A.    No, did you write it?

1    through this article, you exposed that you're a

2    confidential informant, correct?

3                    MS. RADLIN:  Objection to form.

4        A.      Yes.

5        Q.      Before this article came out, there was no public

6    knowledge that you were a confidential informant, correct?

7                    MS. RADLIN:  Objection to form.

8        A.      That I know of.

9        Q.      That you know of.  And in this article --

10       A.      Go back.  You're skipping.  Go back to the part

11   where it says I just wanted to keep it professional.

12   You're not talking about that, are you.

13       Q.      Sorry.  You're not asking me questions,

14   unfortunately.

15       A.      Yeah, I know.

16                    MR. KELEHER:  Give me a moment here.  I'm

17               going to pull up the complaint.

18       Q.      Have you seen this document before that's on your

19   screen, the complaint in this matter?

20       A.      Are you asking have I ever seen that document

21   before?

22       Q.      That was my question, ma'am.

23       A.      This is my first time.

24       Q.      Today is the first time you ever reviewed this

25   complaint?

1    A.    Yes.

2    Q.    You were working as a CI for Detective Howard,

3  how many other CIs did Detective Howard have that you're

4  aware of?

5    A.    Say that again.

6    Q.    You worked as a confidential informant for

7  Detective Howard, how many other CIs was Detective Howard

8  using that you are personally aware of?

9    A.    That he was using while he was working with me?

10   Q.    Yes.

11   A.    I don't know if he had any other CIs.  He didn't

12  disclose that.  I just knew about previous but I don't know

13  if he had anyone while I was under him.

14   Q.    You're aware of a previous CI Detective Howard

15  used?

16            MS. RADLIN:  Objection to form.

17   A.    I know what he told me one day when -- he took me

18  to the hole in the wall bar and grill not too far from my

19  house, and that's when he disclosed to me his name came up

20  on a wire tap, and he was banging the mother of the boy

21  that they were investigating.

22   Q.    What did that have to do with the CI?

23   A.    I don't understand your question.

24   Q.    I'm trying to understand what you know about his

25  previous CI that your previous response didn't answer my

1    question.

2         What did you understand about Detective Howard's

3    relationship with his previous CI?

4              MS. RADLIN:  Objection to form.

5    A.    He didn't say anything about a previous CI.  He

6    just said that he was involved with the boy's mother.

7    Q.    So you have no knowledge of how Detective Howard

8    operated with previous or former --

9    A.    I do also recall Detective Howard telling me out

10   of his own mouth all the other women, if there's women,

11   don't put them with Howie.  He said this out of his own

12   mouth.  If you have any other women that would possibly be

13   a CI, don't put him with Detective Howie, and he even

14   laughed.  He thought that was funny.

15   Q.    Again, my question is, you don't have any

16   personal knowledge of how Detective Howard operated with

17   any previous or any --

18   A.    No, no.

19             MS. RADLIN:  Objection to form.

20   A.    No, I don't.

21   Q.    I need to finish my question, ma'am.  I wasn't

22   even done with the question.  I'm giving you all the

23   respect I can.  I understand you're not happy to be here

24   today.  I'm just doing my job.  Let me ask the question and

25   answer as best you can.  The quicker we get this done, the

1   quicker we can all get over with this.

2           Again, for the third time my question, you, Ms.

3   Reid, have no knowledge as to how Detective Howard operated

4   with any former CIs or new CIs; is that correct?

5                   MS. RADLIN:   Objection to form.

6       A.      No.

7       Q.      Thank you.  When you were working for Detective

8   Howard, how were you paid?

9       A.      I was paid cash through Crime-Stoppers.

10      Q.      How does that work?  How do you get paid through

11  Crime-Stoppers?

12      A.      Detective Howard would call in and he would give

13  a number, and describe whatever it was for the times or

14  case, whatever.  I don't know how that works.  He would

15  call in Crime-Stoppers and give the information, and then I

16  would have to wait for the money and whatever.

17      Q.      So how much did Crime-Stoppers typically pay you?

18      A.      Detective Howard was giving me $1500.  I don't

19  know about the rest.

20      Q.      How often did you receive that $1500?

21      A.      I only received it twice.

22      Q.      How long had you worked for Detective Howard?

23      A.      I worked for him from October 2017 until

24  basically August of 2018 because that's when he officially

25  cut me loose.

1  against Detective Howard and to whom was it made?

2      A.      The very first time I made the report against

3  Detective Howard was when I told Chris, Christopher

4  Guadaluco.

5      Q.      When was that?

6      A.      That was in April of 2018.

7      Q.      You tell Chris in 2018, what does Chris tell you

8  to do?

9      A.      Chris asked me what happened, I told him what

10  happened, and he told me you need to report it to IAB, and

11  I asked him what that was.

12      Q.      After you found out what IAB was and Chris told

13  you to go to IAB, what'd you do?

14      A.      I called CCRB and made the complaint with the

15  civil complaint review board or something.

16      Q.      When was that complaint?

17      A.      It was also made in April 2018.

18      Q.      When did you make your complaint with the IAB?

19      A.      I actually spoke to IAB, actually over the phone.

20  It was between December and January.  Physically, over the

21  phone, they had been calling prior, and Howie was telling

22  me not to speak to them.

23      Q.      When did you eventually speak to them?

24      A.      I eventually spoke to them by phone.  It was

25  between December and January.  December of 2018 and the

1   first week in January of 2019.  That's when I actually,

2   actually spoke to IAB.

3       Q.      And during that meeting, was that your only

4   meeting with IAB?

5       A.      The conversation, the actual meeting was in July

6   when they came to my house in Jersey.  That was physical in

7   person, an in person meeting.

8       Q.      You talked to them for the first time in January

9   of 2019, correct, on the phone?

10      A.      Yes.

11      Q.      When is the next time you talked to them?

12      A.      The next time was in July.

13      Q.      So there was no contact from January of 2019 to

14  July of 2019?

15      A.      It was -- they were leaving me messages.  I just

16  wasn't talking to them.

17      Q.      You had not spoken to them?

18      A.      Right.

19      Q.      July 2019, you had an in person meeting?

20      A.      Yes, sir.

21      Q.      Who was that meeting with, if you recall?

22      A.      It was the lady, Nadia.  She came with a guy.  I

23  never got his name.  I think he was her partner but I never

24  got his name.  It was a female and man.

25      Q.      They took your statement?

1     A.     Yes.

2     Q.     During that time, that's when you told them that

3  you had consensual sex with Greg Howard twice?

4               MR. PAWAR:  Objection to form.

5     A.     Yes.

6     Q.     Did you and Greg Howard ever go on any dates?

7               MR. PAWAR:  Objection to form.

8     A.     No.

9     Q.     Did Greg Howard ever give you any gifts?

10    A.     Yes, he did.

11    Q.     What did he give you?

12    A.     He gave me a gift for Christmas.  He gave me a

13  cheap Mac make up.

14    Q.     What is Mac make up?

15    A.     Mac is a high end make up.

16    Q.     Is that the only gift you ever got from Mr.

17  Howard?

18    A.     Yes.

19    Q.     Did you guys ever live together?

20    A.     No.

21    Q.     Did you ever want to be in a relationship with

22  Greg Howard?

23               MR. PAWAR:  Objection to form.

24    A.     Did I ever want to be in a relationship with him?

25    Q.     Yes, as your boyfriend.

1          MR. PAWAR:  Objection to form.

2     A.     Yes, I saw Detective Howard again in August.

3     Q.     Of 2018?

4     A.     Yes, sir, and then the last and final time was

5     two days after Christmas in 2018.

6     Q.     How many times in total did you see him?

7     A.     In the very beginning starting from the first day

8     I met him?

9     Q.     Yes.

10    A.     Over thirty times.

11    Q.     And in those over thirty times, other than the

12    times you described previously, what did you generally do

13    with Detective Howard?

14    A.     At first -- you have to be more specific.

15    Q.     I'm asking, you described earlier there was a

16    couple of times that you saw Detective Howard, had a sexual

17    encounter, other than those times in over the thirty times

18    you saw him, what else did you do with him?

19          MR. PAWAR:  Objection to form.

20    A.     Before the sexual thing happened, I would just

21    meet with him and discuss the cases that I had gave him.

22    Q.     How many cases did you give him?

23    A.     I gave him two.

24    Q.     One of them was the Lawrence Brown case?

25    A.     Yes, the second one was Joshua Johnson.  Josh.

1    Q.    Do you know if Joshua Johnson was also arrested?

2    A.    Yes, he was arrested.

3    Q.    Do you know how many arrests in total you helped

4    the police with?

5    A.    With Detective Howard, I only know two with him.

6    Q.    You mentioned earlier that your life was in

7    jeopardy when you were in Elizabeth, New Jersey, and you

8    reported to the police, was that the Elizabeth Police

9    Department?

10   A.    Yes.

11   Q.    Did you make any other reports that you thought

12   your life was in jeopardy?

13              MR. PAWAR:  Objection to form.

14   A.    No, it was only Elizabeth police.

15   Q.    When was that?

16   A.    February.  It started in February.

17   Q.    Of 2018?

18   A.    No, February 2021.

19   Q.    Why did you think your life was in jeopardy in

20   February of 2021?

21   A.    Because when my neighbors, the people in the

22   neighborhood saw the story, that's when I started to get

23   threats.

24   Q.    That was the story that Mr. Keleher was asking

25   you about earlier, the New York Post article?

1      A.      Yes.

2      Q.      Were there any other threats to your safety

3   before that?

4                   MR. PAWAR:  Objection to form.

5      A.      Yeah, when Howie was threatening to out me.

6      Q.      Any threats from anyone else?

7      A.      There was something with Lawrence when he got out

8   of prison.

9      Q.      When was that?

10     A.      He got out of prison October of 2000 --

11   October 2020.

12     Q.      Did you report that threat to anyone?

13     A.      I told my lawyer, and then I reported to his

14   parole officer.

15     Q.      Anyone else?

16     A.      No, just my lawyer and Lawrence's parole officer.

17     Q.      So other than that threat and the one you

18   described in February of 2021, anything else?

19     A.      I just told you, me being threatened by Detective

20   Howard.

21     Q.      How did you find out about the October 2020

22   threat from Lawrence Brown?

23     A.      He sent Timothy a message and then he messaged

24   me.

25     Q.      Who is Timothy?

1     A.     My son.

2     Q.     Timothy Reid?

3     A.     Yes, sir.

4     Q.     Where did he send him a message?

5     A.     On Facebook.

6     Q.     Do you have a copy of that message still or does

7     your son?

8     A.     My son might, yeah.  He might have it still.  I

9     don't.  He messaged me.  I blocked him and then I contacted

10    my lawyer first, Vic, and then I contacted Lawrence Brown's

11    parole officer and told her that he was contacting me and

12    contacting my son, which there was an order of protection

13    in place and he wasn't supposed to do that.

14    Q.     When you said he contacted you and you blocked

15    him, did you save a copy of that message anywhere?

16    A.     It was on my other phone, my other phone.  I

17    don't have that phone anymore.

18            MR. FRANK:  I'll call for production of the

19            message to your son if that's still available.

20            I'll follow up in writing on that with your

21            attorney.

22    Q.     The order of protection, do you know what court

23    issued that?

24    A.     Say that again.

25    Q.     The order of protection you just mentioned, do

1  you know what court issued that?

2      A.      The Staten Island, Richmond, the state, Staten

3  Island court, criminal court of Staten Island.

4      Q.      Did you ever communicate with anyone at NYPD

5  about either of these threats you just described from

6  Lawrence Brown or the one in February 2021?

7      A.      You mean did I talk to NYPD after the threats?

8      Q.      Right.

9      A.      No.

10     Q.      Did you have any conversations with anyone at the

11 NYPD about your protection?

12              MR. PAWAR:  I apologize.  I didn't hear the

13         last word.

14     Q.      Did you have any conversations with anyone at

15 NYPD about your protection?

16              MR. PAWAR:  Protection.  Okay.

17     A.      I thought you said projection.

18              MR. PAWAR:  We clarified it.

19              THE WITNESS:  Protection?

20              MR. PAWAR:  Yes.

21     A.      No, no, they knew Howie.  They weren't going to

22 help me anyway.  That's how I felt.

23     Q.      You didn't actually reach out to anyone at NYPD

24 after the threats you just described, right?

25     A.      No, I told my lawyer and I reached out to

1   Lawrence's parole officer.

2       Q.      Do you happen to know the name of that parole

3   officer?

4       A.      And then I also told -- I contacted before I

5   contacted Vic, I contacted the prosecutor who prosecuted

6   the case.

7       Q.      What case?

8       A.      The case between Lawrence and my son.

9       Q.      And do you know the name of the prosecutor?

10      A.      His first name was Timothy.  I don't know his

11  last name.  His first name is Timothy.

12      Q.      He's at the Staten Island DA's office?

13      A.      Yes, sir.

14      Q.      How about the parole officer for Lawrence, do you

15  know his name?

16      A.      It was a female.  I don't know but she was on Bay

17  Street, 16 Bay Street in Staten Island, I think.

18      Q.      Anyone else you communicated with about those

19  threats?

20      A.      No, just the people I named.

21      Q.      You're suing the City of New York in this case,

22  what are you claiming the City of New York did?

23              MR. PAWAR:  Object to form.

24      A.      I'm claiming that the City of New York didn't --

25  they employed a bad cop.  Someone that's not a good person

1  negligent in hiring Detective Howard, how do you know that?

2         MR. PAWAR:  Objection to form.

3     A.     How do I know the city was negligent in hiring

4  Howie?

5     Q.     Yes, that's a claim in this case.  I'm asking

6  what evidence you have for that claim.

7         MR. PAWAR:  Objection to form.

8     A.     I'm going off my conversations with Detective

9  Howard each time I met with him, and the encounters that I

10  had with Detective Howard.  That's how I'm able to come to

11  that conclusion because who hired him, the NYPD hired him

12  as a police officer.  Just how he treated me and behaved

13  with me, that's how I was able to come to that conclusion.

14    Q.     Do you know when he was hired?

15    A.     2006.

16    Q.     Did you know him at that time?

17    A.     No.

18    Q.     So other than what you just described, any other

19  evidence for that claim?

20         MR. PAWAR:  Objection to form.

21    A.     Meaning what?  Did I know him prior to this?

22    Q.     I'll be clear.  Other than you said you had the

23  evidence for this claim is your conversations with

24  Detective Howard, is there any other evidence that the city

25  was negligent in hiring him?

1  was negligent in screening Detective Howard, what's your

2  evidence for that claim?

3           MR. PAWAR:  Objection to form.

4      Q.    You have a claim in this case that the city was

5  negligent in screening Detective Howard, what's your

6  evidence for that claim?

7           MR. PAWAR:  Objection to form.

8      A.    Screening him, they didn't thoroughly do a

9  background check.  I don't know what else to say to that.

10 They just didn't really do a good job of who they were

11 hiring to work for them.

12     Q.    When you say do a background check, you mean back

13 when he was hired in 2006?

14     A.    Yes.

15     Q.    Is there something that you think should have

16 came up on the background check that didn't?

17           MR. PAWAR:  Objection to form.

18     A.    I wouldn't know at that time because he just

19 started.  I'm basically -- I'm going off of how I was

20 treated and his behavior.

21     Q.    Is it fair to say that your evidence for these

22 claims is your personal experiences?

23           MR. PAWAR:  Objection to form.

24     A.    My personal experience with him?

25     Q.    Yes.

1    A.      Yeah, I'm going off of how he treated me.

2    Q.      Similar question, any other evidence for your

3    claim that the city was negligent in training Detective

4    Howard or is that the same thing?

5    A.      It's the same thing.

6            MR. PAWAR:  Objection to form.

7    Q.      How about in retaining Detective Howard as a

8    member of the NYPD, any different evidence for that claim?

9            MR. PAWAR:  Objection to form.

10   A.      They should have let him go when he was being

11   sued by people.

12   Q.      When are you claiming they should had let him go?

13   A.      When he was sued.  He had other lawsuits out

14   there and they were costing the city money.  They should

15   have let him go then but they didn't and that's how this

16   happened to me.

17   Q.      You're claiming that these lawsuits happened

18   before you became his confidential informant; is that

19   right?

20           MR. PAWAR:  Objection to form.

21   A.      Yes.

22   Q.      Have you brought any other lawsuits against the

23   City of New York?

24   A.      No.

25   Q.      Have you ever been a witness in a civil lawsuit

1      A.      Yes, Salomi Thompson.

2      Q.      What information would --

3      A.      I told her about the first incident when Howie

4   did that to me.  I told her what I was doing for the NYPD

5   and for him, and I told her what happened, and we discussed

6   it.  I said, mom, I think he's done this before because

7   he's just too smooth, and she said you're probably right.

8      Q.      And do you have any information that he's done

9   this before?

10                  MR. PAWAR:  Objection to form.

11                  THE WITNESS:  Can we take a break please?

12                  MR. FRANK:  You have to answer the question

13              and then we could take a break.

14                  THE WITNESS:  Repeat the question again.

15      Q.      What information do you have as you say he's done

16   this before?

17      A.      I was only just going off of how everything fell

18   into place with every time we would go out, and we would

19   meet, and he would always take me to a hole in the wall

20   restaurant.  He would always want to drink and this was on

21   more than one occasion.  That's why I said that.

22   Everything was just lining up.  I wasn't used to that

23   behavior.

24      Q.      You asked for a break, so we could take a short

25   break and then I could finish up.

1          D E C L A R A T I O N

2

3               I hereby certify that having been first duly

4     sworn to testify to the truth, I gave the above testimony.

5

6               I FURTHER CERTIFY that the foregoing transcript

7     is a true and correct transcript of the testimony given by

8     me at the time and place specified hereinbefore.

9

10

11

12                    TAKISHA REID

13

14

15    Subscribed and sworn to before me

16    this __3__ day of __December__ 20_22_

17

18

19           NOTARY PUBLIC

20

21               *Cheyanne Davis*
                 *Notary Public - Michigan*
22          *Eaton County - Com. Ex. 10/10/2027*
              *Acting in the county of* Ingham

23

24

25

1                    **E X H I B I T S**

2

3     **EXHIBIT     EXHIBIT                        PAGE**

4     **NUMBER DESCRIPTION**

5      **(None)**

6                    **I N D E X**

7

8     **EXAMINATION BY                        PAGE**

9     **MR. KELEHER                        5 97 122 137 138**

10    **MR. FRANK                        101 127**

11    **MR. PAWAR                        96**

12

13         **INFORMATION AND/OR DOCUMENTS REQUESTED**

14    **INFORMATION AND/OR DOCUMENTS          PAGE**

15    **Formal request for the settlement     15**

16    **document.**

17    **Requests for copies of that          16**

18    **information that is contained in her social media account.**

19    **Copies of all past documents,         28**

20    **W-2s, 1099.**

21    **Copies of all that information from  29**

22    **a certain range of dates.**

23    **Copies of that financial documents   66**

24    **Call for production of the message   110**

25    **to your son if that's still available.**

1

2

3    (Continued request page)

4

5    INFORMATION AND/OR DOCUMENTS          PAGE

6    Request for contact information       134

7    for the witnesses.

8    Production                            135

9                QUESTIONS MARKED FOR RULINGS

10   PAGE LINE    QUESTION

11   86   20     if you can very briefly describe what happened

12   in that incident

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK           )

                                 :  SS.:

4    COUNTY OF ORANGE       )

5

6              I, ALEXANDRA GLASGOW, a Notary Public for and

7    within the State of New York, do hereby certify:

8              That the witness whose examination is

9    hereinbefore set forth was duly sworn and that such

10   examination is a true record of the testimony given by that

11   witness.

12             I further certify that I am not related to any

13   of the parties to this action by blood or by marriage and

14   that I am in no way interested in the outcome of this

15   matter.

16             IN WITNESS WHEREOF, I have hereunto set my hand

17   this 6th day of October 2022.

18

19

20                        *Alexandra Glasgow*

                     ALEXANDRA GLASGOW

21

22

23

24

25

1    ERRATA SHEET
     VERITEXT/NEW YORK REPORTING, LLC
2
     CASE NAME: Reid, Takisha v. Police Department, Nyc
3    DATE OF DEPOSITION: 9/28/2022
     WITNESSES' NAME: Takisha Reid
4
5    PAGE    LINE (S)      CHANGE              REASON
     ___|_____|_____|_____
6
     ___|_____|__1 StAtemen t__|__WASN't fully CoRRect
7    ___|_____|__StAtement____|__WASN+ CoRRect
8
     ___|_____|_____|_____
9
     ___|_____|_____|_____
10
     ___|_____|_____|_____
11
     ___|_____|_____|_____
12
     ___|_____|_____|_____
13
     ___|_____|_____|_____
14
     ___|_____|_____|_____
15
     ___|_____|_____|_____
16
     ___|_____|_____|_____
17
     ___|_____|_____|_____
18
     ___|_____|_____|_____
19
     ___|_____|_____|_____
20
21                                   Takisha Reid
22   SUBSCRIBED AND SWORN TO BEFORE ME
     THIS  3   DAY OF  December, 20__.
23
24   _____  Cheyanne Davis    10/10/2027
                                Notary Public - Michigan
25   (NOTARY PUBLIC)    Eaton County - Com. Ex. 10/10/2027 MY COMMISSION EXPIRES:
                        Acting in the county of Ingham

**CORRECTIONS/ADDITIONS CLAIM** –*Reid v. City, et al.*

| PAGE | LINE | CORRECTION/ADDITION |
|------|------|---------------------|
| 140 | | Detective Howard on May 25th 2018 |
| | | Did you Come to pickup MS Reid |
| | | with The Intentions of having Sex |
| | | Did you Just have on Shorts wythout Any underwear on? |
| | | also did you Push MS Reid head Down so she CAN give you ABlow Job? |
| | | EveRy time you spoke with MS Reid you always Brought up sex |
| | | I never wanted Howie To be my Boyfriend He Told me It ewAs Cutting me loose sowe CAN STARt DAting |
| | | WeRe you upset Howie THAt MS Reid ReJected you. |
| | | |

12/3/2022.
Date

TAKISHA REID

Sworn to before me
this __3__ day of

PAGE _____ OF _____

December 2022

Notary Public

Cheyanne Davis
Notary Public - Michigan
Eaton County - Com. Ex. 10/10/2027
Acting in the county of Ingham

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.