# EXHIBIT 'F'

1

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF NEW YORK

3    ---------------------------------------------------

4    TAKIESHA REID,

5

6              Plaintiff,

7     -vs-                          INDEX NO. 20 CV 3926(FB)(PK)

8    THE CITY OF NEW YORK,
     GREGORY HOWARD,
9    JOHN AND JANE DOES 1-5,

10

11             Defendants.

         ---------------------------------------------------
12              **EXAMINATION BEFORE TRIAL OF GREGORY HOWARD**

13                  **APPEARING REMOTELY FROM**

14                 **NEW YORK CITY, NEW YORK**

15

16

17              Wednesday, October 26th, 2022

18                 10:00 p.m. - 12:10 p.m.

19                  pursuant to notice

20

21   REPORTED BY:

22   Kelly Hairston, Notary Public

23   APPEARING REMOTELY FROM ERIE COUNTY, NEW YORK

                      **CONFIDENTIAL PORTIONS REDACTED**

2

R E M O T E   A P P E A R A N C E S

APPEARING FOR THE PLAINTIFF:

        **VIK PAWAR LAW, PLLC,**
        BY:  **VIK PAWAR, ESQ.,**
        20 Vesey Street, Suite 1410,
        New York, New York 10007,
        (212) 571-0805.


APPEARING FOR THE DEFENDANT DETECTIVE GREGORY HOWARD:

        **LAW OFFICES OF PETER TILL,**
        BY:  **PETER W. TILL, ESQ.,**
        105 Morris Avenue,
        Springfield Township, New Jersey
        07081,
        (973) 258-0064.

APPEARING FOR THE DEFENDANT CITY OF NEW YORK:

        **NEW YORK CITY LAW DEPARTMENT,**
        **FEDERAL LITIGATION DIVISION,**
        **ASSISTANT CORPORATION COUNSEL,**
        BY:  **JEFFREY FRANK, ESQ.,**
        100 Church Street,
        New York, New York, 10007,
        (212) 356-3541.

3

**I N D E X**

WITNESS                 EXAMINATION                    PAGE

Gregory Howard

                        by Mr. Pawar                   04

                        by Mr. Frank                   96

                        by Mr. Pawar                   98

**EXHIBITS**

NUMBER                  DESCRIPTION                    PAGE


**NO EXHIBITS WERE MARKED**

1        **REPORTED REMOTELY FROM NEW YORK CITY, NEW YORK**

2        THE REPORTER:  Will the attorneys participating in

3    this deposition acknowledge that I will administer the

4    oath remotely, and consent to waive any objections to

5    this manner of reporting?

6        Please indicate your agreement by stating your name,

7    who you represent and your agreement on the record,

8    starting with the noticing attorney.

9        MR. PAWAR:  Vik Pawar for the plaintiff.  Yes, I

10   consent.

11       MR. TILL:  Peter Till for Mr. -- for Detective

12   Howard.  Yes, we consent.

13       MR. FRANK:  Jeffrey Frank for the City of New York.

14   We consent.

15

16        **DETECTIVE GREGORY HOWARD,**

17       having been first duly sworn, was examined and

18       testified as follows:

19

20                        EXAMINATION

21   BY MR. PAWAR:

22   Q. Detective Howard, my name is Vik Pawar.  I represent

23       plaintiff Takiesha Reid.  You and I have never met

1     before; correct?

2  A. Yes.

3  Q. I'm going to be asking you some questions regarding a

4     lawsuit that she has brought against the City of New

5     York and yourself personally.  Have you been deposed

6     before?

7  A. For this case, no.

8  Q. Have you been deposed for any other thing?

9  A. Yes.

10 Q. How many times?

11 A. Twice.

12 Q. Was it a civil case?

13 A. Yes.

14 Q. And were you a defendant or a party?

15 A. Party.

16 Q. Have you ever testified under oath other than those two

17    times?

18 A. Yes.

19 Q. How many times?

20 A. For grand jury, approximately 30.

21 Q. Okay.  Anywhere else?

22 A. No.

23 Q. What about GO-14, GO-15, how many times have you done

1    that?

2    A. Approximately five.

3    Q. As a subject or as a witness?

4    A. Both.

5    Q. How many for subject and how many for witness?

6    A. I do not know.

7    Q. Is there anything that would help you find that

8    information?

9    A. The documents from the GOs.

10   Q. And who has possession of that?

11   A. It would be to internal affairs.

12   Q. Detective Howard, you can hear me; right?

13   A. Yes, I can.

14   Q. Okay.  So when I ask you a question and you give me an

15   answer, I'm going to take it to believe that you

16   understood my question and you gave me an answer that

17   you felt was the proper answer to that question; do you

18   understand that?

19   A. Yes, sir.

20   Q. Try to give a verbal response.  If you need to take a

21   break, you can.  Just do not do so if a question is

22   pending.  If you need to speak with an attorney or your

23   lawyer, you're more than welcome to do that, but just

1    make sure there's no question pending.  And if you ever

2    need a break, just let me know, okay?

3  A. No problem.

4  Q. All right.  How long have you been living at ▮▮▮▮

5    ▮▮▮▮▮?

6  A. Two years.

7  Q. And did you live at ▮▮▮▮▮▮▮▮▮▮▮▮ before that?

8  A. Yes, sir.

9  Q. Besides Mr. Till, did you discuss your deposition with

10    anyone?

11  A. No.

12  Q. Have you discussed this case with anyone besides Mr.

13    Till?

14  A. In the beginning with the DEA, my unit.

15  Q. I'm sorry, apologize.  DA?

16  A. DEA, my unit.

17  Q. Oh, DEA, okay.  And who else?

18  A. That's all.

19  Q. So you discussed with the DEA about this lawsuit?

20  A. Yes.

21  Q. Who did you discuss -- is there a male, female or

22    something else?

23  A. Jim Moschella.

1    Q. Oh, I'm sorry, you mean the Detectives Endowment

2       Association?

3    A. Yes.

4    Q. And Jim is the attorney there?

5    A. Yes.

6    Q. All right.  So whatever you say with them, that's -- I

7       don't need to know, okay?  I was thinking of Drug

8       Enforcement Agency.  But besides Jim and Peter, did you

9       discuss this lawsuit with anyone?

10   A. No.

11   Q. What about your delegate?

12   A. That was with Jim Moschella.

13   Q. While Jim Moschella was in the room?

14   A. Yes.

15   Q. What is your delegate's name?

16   A. At that time, it was Greg Silverman.

17   Q. And do you know if Greg is an attorney?

18   A. No.

19   Q. So what did you discuss in that conference?

20   A. It was the -- I was given the complaint and they were

21      trying to figure out if the City of New York was going

22      to represent me or if the DEA were, that's all.

23   Q. And what happened after that, did they come to some

1          sort of a resolution?

2     A. It was stated that the City of New York was not going

3          to represent me and that the DEA would, and I declined

4          using the DEA.

5     Q. Okay.  Did you come to an understanding as to why the

6          City of New York was not going to represent you?

7     A. No.

8     Q. Do you know today why the City of New York is not

9          representing you?

10    A. No.

11    Q. Did you review any documents prior to your deposition

12         today?

13    A. Documents for this case?

14    Q. Well, you knew you had a deposition today; right?

15    A. Yes.

16    Q. Okay.  I'm not concerned if you read the Post this

17         morning, I'm concerned if you read any documents in

18         preparation for this deposition?

19    A. Yes.

20    Q. And what documents did you review?

21    A. I just had a conference with my lawyer.

22    Q. Okay.  Did you review any documents with him?

23    A. No.

1    Q. Okay.  Have you seen any documents regarding this case

2        ever?

3    A. Yes.

4    Q. Which documents have you seen?

5    A. The interrogatories and the derogatories.

6    Q. Anything else?

7    A. Emails.

8    Q. Emails between whom and who?

9    A. Between Jeffrey Frank and yourself.

10   Q. Okay.  What else?

11   A. Went through the IAB case for documents.

12   Q. Okay.

13   A. And that's basically it.

14   Q. Okay.  When did you start working for the NYPD?

15   A. In 2006, January 31st, 2006.

16   Q. Thank you.  And where were you employed before that?

17   A. Staten Island Developmental Disability Services Office

18       in Staten island.

19   Q. And how many years was that?

20   A. Six years.

21   Q. Just to put it in context, can you tell us your age?

22   A. 46.

23   Q. Are you married?

```
 1      A. No.

 2      Q. Any kids?

 3      A. No.

 4      Q. Did you ever work for the Department of Corrections?

 5      A. No.

 6      Q. When you started as a -- I'm sorry, when you started

 7         with the NYPD in 2006, what was your rank?

 8      A. Probationary police officer.

 9      Q. And did that probationary title ever come off the

10         police officer -- I'll withdraw that.

11            At what point did the probationary period end for

12         you as a police officer?

13      A. My probationary period ended in 2008.

14      Q. And then after that, you were just a police officer in

15         2008?

16      A. Yes.

17      Q. Okay.  And at some point, you were promoted to

18         detective?

19      A. Yes.

20      Q. What year was that?

21      A. 2017.

22      Q. Third grade?

23      A. Yes, sir.
```

GREGORY HOWARD -- BY MR. PAWAR -- 10/26/2022          12

1       Q. And are you the same grade now?

2       A. No.

3       Q. What's your grade now?

4       A. I'm a detective specialist.

5       Q. Is that a step below second grade?

6       A. It's not a step below.  It's, it's equivalent to being

7          a third grader, but you're not an investigator, you're

8          just a specialist.

9       Q. And when did you become that, approximately what year

10         did you become a detective specialist?

11      A. 2020.

12      Q. Was there an increase or decrease in pay?

13      A. No.

14      Q. Is that something that you wanted?

15      A. No.

16      Q. Then who assigned you to that specialist role?

17      A. The NYPD.

18      Q. Did they give you a reason why?

19      A. No.

20      Q. Were you happy with it?

21      A. No.

22      Q. Did you do -- did you file a grievance with the

23         union?

1  A. No.

2  Q. And it's true that you never found out, you never asked

3    the NYPD why they did that?

4  A. I have asked.

5  Q. And what was your response?

6  A. I never got a response.

7  Q. And how did you ask -- how did you ask, was it in

8    writing or by phone or anything else?

9  A. By phone.

10  Q. And who did you speak with?

11  A. Jim Moschella.

12  Q. Well, that's your -- that's the DEA lawyer; right?

13  A. Yes.

14  Q. Okay.  So you complained to him about your assignment

15    as a detective specialist; is that correct?

16  A. Yes.

17  Q. And his response was I don't know or --

18  A. He didn't know and he would look into it.

19  Q. Did he ever look into it?

20  A. That I know of, no.

21  Q. Did you put anything in writing regarding your new

22    designation?

23  A. No.

1    Q. What is the difference between a third grade detective

2       and a detective specialist in terms of

3       responsibilities?

4    A. The third grade detective most likely is in a detective

5       bureau doing investigative work, and a detective

6       specialist was granted a shield because of the work

7       that he's done with his performance or has given to --

8       given to him by a superior.

9    Q. So could a non-detective become a detective

10      specialist?

11    A. Say that again.

12    Q. So let's say you were not a third grade detective,

13      let's say you were still a police officer.  Could

14      somebody, a superior officer give you a designation of

15      detective specialist without you being a detective?

16    A. Yes.

17    Q. Okay.  So you don't necessarily have to be a third

18      grade detective or any grade detective to get the title

19      of detective specialist?

20    A. That's correct.

21    Q. And I take it that is still your position today as

22      detective specialist?

23    A. Yes.

GREGORY HOWARD -- BY MR. PAWAR -- 10/26/2022          15

1      Q. So it's fair to say that for three years from 2017 to
2         2020 approximately, you were a third grade in the
3         detective bureau; correct?
4      A. Yes.
5      Q. And what was your assignment during that -- those three
6         years?
7      A. From 2017 to 2019, I was in the 120 Detective Squad.
8      Q. And as part of the detective squad, were you involved
9         in any special assignments?
10     A. No special assignments.
11     Q. So you did everything from investigation of crime to
12        domestic violence, like, the gamut?
13     A. Yes.
14     Q. When did you start becoming involved with confidential
15        informants?
16     A. October 2017.
17     Q. So before you -- it's fair to say you got promoted to
18        third grade before October 2017; correct?
19     A. Yes.
20     Q. And that was at the 120th Precinct?
21     A. Yes.
22     Q. And when you were a police officer, what precinct was
23        that, 122?

1    A. The 120th.

2    Q. 120th.  So when you got promoted from -- when you got

3       promoted to a third grade detective, did you undergo

4       any sort of training when it comes to confidential

5       informants?

6    A. No.

7    Q. So you testified that October 17th is when you started

8       first -- you know what I mean by a CI; right?

9    A. Yes.

10   Q. Okay.  So I'm just going to use the word CI, just so --

11      so October 17th is the first time you started dealing

12      with a CI?

13   A. Yes.

14   Q. And your testimony is that you received no training

15      prior to that?

16   A. No, we have a patrol guide.

17   Q. And did you read the patrol guide?

18   A. At that time, no.

19   Q. So what was your first encounter with the CI in October

20      2017?

21   A. With Ms. Reid?

22   Q. Well, was Ms. Reid your first CI?

23   A. First and only.

1    Q. I apologize.  I was ripping a paper off, so I didn't --

2        was Ms. Reid your first CI?

3    A. Yes, sir.

4    Q. Okay.  And how many other CIs did you have -- by the

5        way, withdraw that.

6            As a detective specialist, are you allowed to have a

7        CI now?

8    A. I can.

9    Q. When was the last time you had one as a detective

10       specialist?

11   A. I haven't.

12   Q. Have you asked for it?

13   A. No.

14   Q. Any reason why?

15   A. At my job at this moment, I'm not in a position to have

16       confidential informants.

17   Q. So it's a decision that's made by people higher than

18       you that you don't have any contact with CI -- CIs?

19   A. That's never been stated.

20   Q. But you just told me that in your position now you're

21       not supposed to have any contact with CI, what made you

22       come to an understanding that that's the case?

23           MR. TILL:  Objection as to form.  Go ahead and

```
 1        answer the question.

 2              THE WITNESS:  In my position now in the precinct, on

 3        a precinct level, I'm not in a unit that is

 4        investigatory or intelligence.  I'm a patrol officer.

 5

 6   BY MR. PAWAR:

 7   Q. Would you consider that to be a demotion considering

 8        you were working a detective squad?

 9              MR. TILL:  Objection as to form.  Go ahead and

10        answer the question.

11              THE WITNESS:  No.

12

13   BY MR. PAWAR:

14   Q. You like being a patrol officer just as good as you

15        like being in the detective squad?

16   A. Yes.

17   Q. But it's your desire that you wanted to be a -- it

18        wasn't your choice that you got the detective

19        specialist job; correct?

20   A. No, it was not.

21   Q. If you had a choice, would you have stayed in the

22        detective squad?

23   A. Yes.
```

1    Q. Why?

2    A. Overtime.

3    Q. So as a detective specialist, you don't get as much

4       overtime as you would have if you were in the detective

5       squad?

6    A. No, I don't because I'm on patrol.

7    Q. So approximately in 2019, how much of overtime were you

8       getting in the detective squad?

9    A. In 2019?

10   Q. Yes.

11   A. Give or take, 30, 40 hours a month.

12   Q. And on patrol, how many hours of overtime are you

13      getting?

14   A. None.

15   Q. Is there a document in front of you, Detective

16      Howard?

17      MR. TILL:  No, just papers on the table.  They're my

18      notes.

19

20   BY MR. PAWAR:

21   Q. So from 2017 to 2020 approximately, when you were on

22      the detective squad, besides Ms. Reid, how many other

23      CIs did you have?

1     A. One.

2     Q. And what was that person's name?

3        MR. TILL:  Objection.  I'm directing him not to

4     answer that.

5

6  BY MR. PAWAR:

7     Q. So besides Ms. Reid, there was another individual who

8        worked as a CI for you?

9     A. She didn't work.  I was told to make her a CI and then

10       when she was a CI, I was told to deactivate her.

11    Q. Okay.  We're not talking about Ms. Reid, you're talking

12       about somebody else; right?

13    A. Someone else.

14    Q. Okay.

15       MR. PAWAR:  We'll mark that for -- Peter, we'll mark

16    this for a ruling, for a ruling from the judge

17    regarding the CI's name.

18       MR. FRANK:  I'd just like to note my objection to

19    the record as well on the law enforcement privilege and

20    we'll mark it for a ruling.

21

22  BY MR. PAWAR:

23    Q. Detective Howard, this other CI you stated, I take it

```
 1        it's a female?
 2   A. Yes.
 3   Q. Okay.  And when did you first engage with her?
 4   A. I've known this person for years.
 5   Q. When you say years, can you tell us approximately how
 6        many?
 7   A. 15 plus.
 8   Q. And you were told to approach her to be a CI, she
 9        became a CI and then you had to deactivate her?
10   A. I wasn't told to approach her.  There was an IAB
11        investigation with her involved.
12   Q. Okay.  And whose idea was it for this individual to
13        be -- become a CI?
14   A. Internal affairs.
15   Q. And they request that you approach her because you've
16        known her for such a long time?
17   A. Because she gave pertinent information about cases.
18   Q. No, no, I understand that.  How did you approach this
19        individual, did you give her a phone call, did you
20        approach her in person and say hey, do you want to work
21        with us as a CI, how did that come about?
22   A. Phone call.
23   Q. And did she agree to be a CI?
```

1    A. Yes.

2    Q. And for approximately how long was she working as a CI

3       for you?

4    A. She never worked.  She was signed up approximately a

5       month and then internal affairs said to deactivate

6       her.

7    Q. Okay.  So when you said that she had given pertinent

8       information about cases, was that the information she'd

9       given to you within that one month period?

10   A. Yes, and before.

11   Q. Before she became a CI?

12   A. Yes.

13   Q. What type of information would she give you?

14   A. People that were involved in shootings, gang members.

15   Q. And why was she doing this?

16   A. She was a friend.

17   Q. And did she get compensated in any way?

18   A. No.

19   Q. How long has she been a friend of yours?

20   A. 15 years plus.  I went to school with her family.

21   Q. And she lives in Staten Island?

22   A. Yes.

23   Q. When was the last time you spoke with her?

1   A. 2018.

2   Q. All right.  Besides this -- so she gave you information

3       prior to her being a CI for a month; correct?

4   A. Yes.

5   Q. And she gave you information about a shooting, gang

6       members, firearm because she wanted to give it to you

7       because you were her friend?

8   A. Yes, and she just wanted to be a good citizen.

9   Q. And did she get anything in return?

10   A. No.

11   Q. Did you have any -- did the department have any

12       problems with her?

13   A. They told me to deactivate her because she had been

14       arrested before.

15   Q. And did you know that?

16   A. One time for domestic.

17   Q. No, but you knew that she had been arrested before?

18   A. Only one time for the domestic incident, that's it.

19   Q. Right.  My question is, before she became a CI for a

20       month, you knew that she was arrested for domestic

21       violence or domestic incident?

22   A. Yes.

23   Q. And did you do any investigation before you signed her

GREGORY HOWARD -- BY MR. PAWAR -- 10/26/2022          24

1          up for a month as a CI?

2               MR. TILL:  Objection as to form.  Go ahead and

3          answer the question.

4               THE WITNESS:  Investigation on her?

5

6     BY MR. PAWAR:

7     Q. Yes.

8     A. No, because internal affairs told me to sign her up.

9     Q. And at what point did somebody realize that she had a

10         prior arrest?

11    A. I knew she had a prior arrest.  When I called internal

12         affairs back to let them know that I had done what they

13         had told me to do so, they had called me back and

14         stated to deactivate her because of conflict.

15    Q. What conflict was that?

16              MR. TILL:  Objection as to form.  Go ahead and

17         answer the question.

18              THE WITNESS:  I do not know, you'd have to ask

19         IAB.

20

21    BY MR. PAWAR:

22    Q. Who from IAB called you?

23    A. Lieutenant Parisi.

1    Q. Can you spell that last name, please?

2    A. P-a-r-i-s-i, and Sergeant Fong, F-o-n-g.

3    Q. So these two individuals from IAB told you to

4       deactivate this new lady who was the CI?

5    A. Yes.

6    Q. And it's because of an arrest that they became aware of

7       or you don't know?

8    A. I do not know what the reason is.

9    Q. Do you know if this CI made any complaint against

10      you?

11   A. That I know of, no.

12   Q. What is your relationship with Lieutenant Bannon?

13   A. My relationship with Lieutenant Bannon?

14   Q. Yes.

15   A. He was my supervisor.

16   Q. From what years?

17   A. He was my detective supervisor and my special

18      operations supervisor.  So probably about 7 years he

19      was my supervisor.

20   Q. While you were -- he was supervisor when you were a

21      police officer?

22   A. Yes.

23   Q. And when did he stop supervising you?

1      A. When he left and went to the detective bureau.

2      Q. What year was that?

3      A. I do not know.

4      Q. Who is your supervisor now?

5      A. My lieutenant is Lieutenant Nicoletti.

6      Q. Was Captain Hollywood ever there when you were working

7         at the 120?

8      A. That I can recall, no.

9      Q. Special operations, what type of jobs were you doing in

10        the special operations?

11     A. My last assignment was leads online and graffiti.

12     Q. What was that, something online and graffiti?

13     A. Leads online.

14     Q. Leads online, yeah?

15     A. Yes.

16     Q. L-e-a-d-s?

17     A. Yes.

18     Q. What do you mean by that?

19     A. Leads online was a corporation/unit that would monitor

20        the sale of stolen goods, petit larceny goods, anything

21        that someone sold or stole, but sold in a pawn shop.

22     Q. And what years were you in that unit?

23     A. 2013 to '15.

1    Q. When did you first meet Ms. Reid?

2    A. October 2017.

3    Q. And what was the circumstances of you meeting her?

4    A. Domestic violence.

5    Q. What I mean by circumstances, how did you first come to

6       know her?

7    A. She was a witness for a domestic violence incident.

8    Q. Did it have anything to do with a domestic violence

9       incident with the second CI?

10   A. No.

11   Q. Okay.  So she was a witness and you were, I guess,

12      interviewing her as part of your job as a detective?

13   A. Yes.

14   Q. And when did this domestic violence incident take

15      place, if you remember?

16   A. I cannot remember the approximate date, but it was with

17      her friend Tonya.

18   Q. And was Tonya the domestic violence victim?

19   A. Yes.

20   Q. Did there ever come a time when you asked Ms. Reid to

21      become a CI?

22   A. After she stated that there was a gun in the

23      apartment.

1    Q. A gun in whose apartment?

2    A. Lawrence Brown.

3    Q. So out of the blue while you were interviewing her

4       regarding this domestic DV incident, she just comes out

5       and says I know where you can find a gun and it's in

6       Mr. Brown's apartment?

7          MR. TILL:  Objection as to form.  Go ahead and

8       answer the question.

9          THE WITNESS:  She was living with Mr. Brown and

10      stated that he had a gun in the apartment.

11

12   BY MR. PAWAR:

13   Q. Did she tell you what the relationship was with her and

14      Mr. Brown?

15   A. No.

16   Q. Did you find it odd that somebody would be snitching

17      someone out who they live with?

18          MR. TILL:  Objection as to form.  Go ahead and

19      answer the question.

20          THE WITNESS:  No.

21

22   BY MR. PAWAR:

23   Q. And what did you do with that information?

```
 1      A. I forwarded it to my lieutenant and spoke to him and
 2         said that she had a gun in the house and what would you
 3         want to do about it?  And they told me to go ahead, run
 4         with it and figure out a way to sign her up and get the
 5         gun.
 6      Q. All right.  So prior to this -- prior to her telling
 7         you about this gun, you had no -- any sort of knowledge
 8         about her being a truthful informant; correct?
 9      A. Correct.
10      Q. So when your lieutenant said -- which lieutenant was
11         it, Brennan?
12      A. Bannon.
13      Q. Bannon, I'm sorry.  And he said to go run with it;
14         right, and to sign her up?
15      A. Yes.
16      Q. So what steps did you take to sign her up?
17      A. Paperwork.
18      Q. What type of paperwork?
19      A. CI registration paperwork.  Paperwork, background check
20         on her, running her history, if she had any open
21         cases.
22      Q. Anything else?
23      A. That's all.
```

GREGORY HOWARD -- BY MR. PAWAR -- 10/26/2022          30

1   Q. And did you get her to sign anywhere?

2   A. Yes.

3   Q. What kind of papers did you get her to sign?

4   A. She signed the papers to have her be a confidential

5       informant and she signed papers for when she received

6       the money from the warrants.

7   Q. And who has this paperwork with the signature on it?

8   A. The paperwork for the money?

9   Q. Yeah -- I'm sorry, go ahead.

10  A. The paperwork for the money is in the IAB

11      investigation.

12  Q. Okay.  And the CI, her signing to be a CI?

13  A. That paperwork has not been found.

14  Q. Do you know what happened to it?

15  A. I was transferred twice, so within me moving twice, the

16      paperwork has been lost.

17  Q. Who was the last person who had that paperwork?

18  A. Myself.

19  Q. And what year was that?

20  A. 2017.

21  Q. And where did you move to twice that seemed to have

22      lost this paperwork in the shuffle?

23  A. I went from the 112 squad to the 123 squad, and then

1       from the 123 squad, I went to the 122 squad.

2    Q. Are you aware that as part of the protocol policies,

3       you're supposed to hang onto every piece of paperwork

4       that's department property?

5          MR. TILL:  Objection as to form.  Go ahead and

6       answer the question.

7          THE WITNESS:  Yes.

8

9    BY MR. PAWAR:

10   Q. And do you know what happens if you misplace department

11      property?

12         MR. TILL:  Objection as to form.  Go ahead and

13      answer it.

14         THE WITNESS:  I found out what happened through the

15      IAB investigation, yes.

16

17   BY MR. PAWAR:

18   Q. What happened?

19   A. I was -- they took 45 days.

20   Q. 45 days for missing paperwork?

21   A. For missing paperwork and not having a supervisor

22      present at all times and for knowingly speaking with

23      a -- knowingly speaking with a known criminal.

1    Q. The money that you gave to Ms. Reid, you said it came

2       from the warrants?

3         MR. TILL:  Objection as to form.  Go ahead and

4       answer the question.

5         THE WITNESS:  Yes.

6

7    BY MR. PAWAR:

8    Q. And are they the ones who are responsible for

9       dispensing cash to CIs?

10   A. Gun Stoppers is responsible.

11   Q. Do you know if Ms. Reid ever got any money from Gun

12      Stoppers?

13   A. Yes, she did.

14   Q. She got money from warrants, she got money from Gun

15      Stoppers and --

16   A. No, she got money for the warrant from Gun Stoppers.

17   Q. Oh.  What do you mean for the warrant?

18   A. Because she stated there was a gun in the apartment,

19      there was a warrant drawn up to go into the apartment

20      and what was found in the apartment was a firearm.  So

21      she was awarded the money for the firearm due to the

22      warrant.

23   Q. Okay.  And the money came from Gun Stoppers?

```
1    A. Yes.

2    Q. Okay.  Did she get money from anywhere else besides Gun

3       Stoppers?

4    A. Not that I know of.

5    Q. Anything, money from Cop Shot?

6    A. Who?

7    Q. Shot Cop -- I'm sorry, I don't mean to disparage.  I

8       don't know what -- either it's Cop Shot, C-o-p,

9       S-h-o-t, or S-h-o-t, C-o-p.  Do you know what I'm

10      talking about there?

11   A. No.

12   Q. I'm sorry?

13   A. I don't know what that is.

14   Q. There's a reward if there's information about an

15      officer being shot?

16   A. That's more if there's an open case going with the

17      person and they give information that solves the

18      crime.

19   Q. Okay.  So when this money came from Gun Stoppers, was

20      it a check or cash?

21   A. Cash.

22   Q. Do you know approximately how much it was?

23   A. 1,500.
```

```
 1      Q. And you'd hand delivered this to Ms. Reid?

 2      A. No.

 3      Q. How did she get, obtain -- how did she get this money

 4         then?

 5      A. My lieutenant.

 6      Q. Lieutenant Bannon gave her the 1,500?

 7      A. Yes.

 8      Q. And did you get any money from that?

 9      A. No.

10      Q. And where did Lieutenant Bannon get the 1,500 from?

11      A. From Gun Stoppers.

12      Q. And is that a citywide thing or is that a precinct by

13         precinct?

14      A. Citywide.

15      Q. So you must have had to make a report to someone on a

16         citywide level to get cash for $1,500 to give to Ms.

17         Reid; is that fair?

18      A. Yes.

19          MR. TILL:  Objection as to the form of the question.

20         Please go ahead and answer it.  I think the answer was

21         in the affirmative.

22

23      BY MR. PAWAR:
```

1    Q. Detective Howard, did you know who Lieutenant Bannon

2       was contacting to get the cash?

3    A. Yes, there's paperwork for Gun Stoppers.

4    Q. And the paperwork is in the IAB file?

5    A. Yes.

6    Q. How many times did Ms. Reid get money for being a CI

7       besides this one?

8    A. Twice.

9    Q. I'm sorry, go ahead.

10   A. This one and one other.

11   Q. Okay.  Tell me about the other one.

12   A. It was in January 2018.  She had said that she has

13      another gun to give and said who it was and the same

14      process was done.  A warrant was given, a gun was found

15      and she was paid 1,500.

16   Q. Any other time, was she given any money?

17   A. No.

18   Q. Any other time, did she provide you with information?

19   A. No.

20   Q. When did you end the CI relationship with Ms. Reid?

21       MR. TILL:  Objection as to form.  Go ahead and

22      answer the question.

23       THE WITNESS:  The CI, when was she deactivated?

1

2      BY MR. PAWAR:

3      Q. Yes, okay -- yes, you're correct.  When was she

4          deactivated as your CI?

5      A. August 2018, I believe.

6      Q. '18 you said?

7      A. Yes.

8      Q. So it's fair to say that approximately October of 2017,

9          around there, you enlisted her as being your CI and

10         then approximately August of 2018 she was

11         deactivated?

12     A. Yes.

13     Q. When was the last time you saw Ms. Reid?

14     A. 2018.

15     Q. And what was the circumstances of you seeing her this

16         last time?

17     A. In 2018 was when she got paid for the gun found, the

18         warrant.

19         MR. TILL:  Speak up, please.  I just asked my client

20         to please speak up.

21         MR. PAWAR:  Thank you.

22

23     BY MR. PAWAR:

```
 1    Q. Detective Howard, you said that she was given a payment
 2       for the gun in Mr. Brown's house and she gave that
 3       information some time around October of 2017, and then
 4       she was given another payment in January of 2018 for
 5       1,500.  Was there a third payment that you last saw her
 6       for in 2018?
 7    A. No payment.
 8    Q. So can you describe the circumstances that you -- where
 9       you met her?
10    A. Where I met her?
11    Q. Or was it -- yeah?
12    A. She would show up to the precinct.
13    Q. And that was the last time you saw her was at the
14       precinct?
15    A. Yes.
16    Q. Have you had any contact with her since then by phone,
17       email or anything else?
18    A. Phone.
19    Q. When was the last time you had a contact with her on
20       the phone?
21    A. January 2019.
22    Q. And what was the sum and substance of your phone call
23       conversation with her?
```

1    A. I do not recall.

2    Q. How many times did you speak with her after she was

3       deactivated?

4    A. I would say once a week.

5    Q. What about when she was a CI from 10-27 -- I'm sorry,

6       10-17 to 8-18, how often would you see her?

7    A. See her?  Any time she would show up to --

8    Q. I'm sorry, see her or talk to her?

9    A. See her was anytime she showed up at the precinct.

10   Q. Okay.  And by the time -- while she was being a CI, did

11      you ever meet her outside the precinct?

12   A. Once.

13   Q. When was that?

14   A. For her to call Gun Stoppers.

15   Q. I'm sorry?

16   A. For her to call Gun Stoppers.

17          MR. PAWAR:  Could you repeat my last question,

18      please?

19          THE WITNESS:  When did I see her?

20          (Whereupon, the reporter read back the question.)

21          MR. PAWAR:  You want me to repeat the question,

22      Detective Howard?

23          THE WITNESS:  Sure.

1

2      BY MR. PAWAR:

3      Q. So while she was a CI from 10-17 to 8-18, how many

4         times did you meet her outside of the precinct?

5      A. For Gun Stoppers.

6      Q. What does that mean?

7      A. For her to call Gun Stoppers.

8      Q. But how is that -- how is calling Gun Stoppers mean

9         that you're meeting with her?

10     A. Because I was in person with her.

11     Q. And where was this?

12     A. On Prospect by Goodhue.

13     Q. What is that, a satellite office for the precinct or --

14     A. No.  She wouldn't come to the precinct because she

15        didn't want to come to the precinct.  For some oddball

16        reason, she wouldn't want to come to the precinct.  She

17        would want to do a phone call in person by her house.

18     Q. So you drove to her house?

19     A. Yes.  I would meet her by her house, not at her house.

20     Q. Okay.  And how would she get to the location where you

21        are?

22     A. I figured she walked.

23     Q. And were you on duty at the time that she met with you

GREGORY HOWARD -- BY MR. PAWAR -- 10/26/2022          40

1          to call Gun Stoppers?

2     A. Yes.

3     Q. And was it a street corner or an establishment or

4          something else?

5     A. Street corner.

6     Q. So you met with her on a street corner and then she

7          called Gun Stoppers from what phone?

8     A. Her phone.

9     Q. And then how long did this interaction last?

10    A. Five minutes.

11    Q. And then she went home?

12    A. Yes.

13    Q. And did you tell anybody about this?

14    A. No.

15    Q. Do you know what ghost guns are?

16    A. Ghost guns?

17    Q. Yes.

18    A. I heard of them.

19    Q. Do you know what burner phones are?

20          MR. TILL:  Objection as to form.  Go ahead and

21       answer the question.

22          THE WITNESS:  I've heard of them also.

23

```
1      BY MR. PAWAR:

2      Q. Have you ever used a burner phone?

3      A. No.

4      Q. Have you ever given CIs a burner phone?

5      A. No.

6      Q. Is there any reason for Ms. Reid to believe that you

7         had given her a burner phone?

8      A. No.

9      Q. So after she left being a CI, you said -- withdraw

10        that.

11            You said you had communication with her January of

12        2019; correct?

13     A. That would be the last one, yes.

14     Q. Okay.  But before that and after she was deactivated,

15        you said you spoke to her once a week?

16     A. Approximately.

17     Q. And what was the nature of those calls?

18     A. She would just call.

19     Q. She would call and you would pick up?

20     A. Yes.

21     Q. And what would you talk about?

22     A. She would talk about her life.

23     Q. And you would just sit there and listen?
```

1    A. Yes.

2    Q. You wouldn't talk to her about your life?

3    A. Somewhat.

4    Q. So would you say this was sort of like a friendly

5       conversation that you were having with her?

6    A. It would be.

7    Q. And then that ended in January of 2019?

8    A. Yes.

9    Q. What was the reason for that?

10   A. There was no reason.

11   Q. You just stop answering her phone calls?

12   A. Yes.

13   Q. What number would she call you at?

14   A. I do not remember.

15   Q. How many phones do you have, Detective Howard?

16   A. Two, one for work and one personal.

17   Q. And did you have the same phones two or three years

18      ago?

19   A. Yes, sir.

20   Q. Same numbers?

21   A. Yes, sir.

22   Q. And how long were the duration of these calls?

23   A. 5 minutes, 10 minutes.

1     Q. Would you be able to tell from the phone records

2        whether a certain phone call was from Ms. Reid?

3     A. No, I wouldn't.

4     Q. So you said this conversation would last about a

5        minute?

6     A. No, 5 minutes to 10 minutes.

7     Q. I apologize, I misheard it.  Did you ever have a

8        physical relationship with Ms. Reid?

9     A. No.

10    Q. Fair to say you've never physically touched her?

11    A. No.

12    Q. It's fair to say or it's not fair to say?

13    A. It's fair to say I never touched her.

14    Q. Okay.  So it's also fair to say that you've never had

15       any sexual relations with her?

16          MR. TILL:  Objection.

17          THE WITNESS:  Fair to say I never did.

18          MR. TILL:  Objection.  You're getting into an area

19       that unfortunately may trigger the Fifth Amendment.

20          MR. PAWAR:  Well, he can invoke it if he wants.

21

22    BY MR. PAWAR:

23    Q. So Detective Howard, did you have any sexual --

```
 1              MR. TILL:  As to that question, as to that question,
 2         I'll instruct Detective Howard to assert his Fifth
 3         Amendment right to remain silent.
 4              MR. PAWAR:  Okay.
 5
 6    BY MR. PAWAR:
 7    Q. Detective Howard, did you have any sexual relationship
 8         with any other CIs?
 9              MR. TILL:  Objection, go ahead.
10              THE WITNESS:  Fifth Amendment?
11              MR. TILL:  Um-hmm.
12              THE WITNESS:  I invoke my Fifth Amendment.
13
14    BY MR. PAWAR:
15    Q. Did you ever meet with Ms. Reid at a bar?
16              MR. TILL:  I'm sorry, I didn't hear that and I
17         apologize.
18
19    BY MR. PAWAR:
20    Q. I said, did you ever meet Ms. Reid at a bar or
21         restaurant?
22    A. No.
23    Q. Would you answer still the Fifth Amendment if I asked
```

1          you if Ms. Reid ever had any sexual encounters with

2          you?

3              MR. TILL:  I'll instruct my client to assert his

4          Fifth Amendment right to remain silent.

5              THE WITNESS:  I assert my Fifth Amendment.

6

7     BY MR. PAWAR:

8     Q. Okay.  Going forward, you can just say Fifth Amendment

9          and we'll all know what that means, Detective Howard,

10         after your lawyer says so.

11             Did Ms. Reid ever get you any gifts for Christmas?

12    A. No.

13    Q. Did you ever get any gifts for Christmas from Ms.

14         Reid?

15    A. No.

16    Q. Did you and Ms. Reid ever exchange any gifts for any

17         other occasion?

18    A. No.

19    Q. Detective, do you know the difference between

20         consensual sex and rape?

21             MR. TILL:  Objection as to form, instructing the

22         client to go ahead and assert his Fifth Amendment right

23         to remain silent.

GREGORY HOWARD -- BY MR. PAWAR -- 10/26/2022    46

1          THE WITNESS:  Fifth Amendment.

2

3    BY MR. PAWAR:

4    Q. Do you know that Ms. Reid made an allegation that you

5       and her had sexual relations?

6          MR. TILL:  I'm instructing my client to assert his

7       Fifth Amendment right to remain silent.

8          THE WITNESS:  Fifth Amendment.

9

10   BY MR. PAWAR:

11   Q. Did you ever tell Ms. Reid that you would deactivate

12      her as a CI because you wanted to date her?

13   A. No.

14   Q. Did you ever want to date Ms. Reid?

15   A. No.

16   Q. Did you ever make any sexual overtures to Ms. Reid?

17         MR. TILL:  Objection, I'm directing the client to

18      assert his Fifth Amendment right to remain silent.

19         THE WITNESS:  Fifth Amendment.

20

21   BY MR. PAWAR:

22   Q. Did you have any romantic -- withdraw that.

23         Did you have any sort of a romantic relationship

1       with Ms. Reid?

2          MR. TILL:  Objection as to form and I'm directing

3       the client to assert his Fifth Amendment right to

4       remain silent.

5          THE WITNESS:  Fifth Amendment.

6

7   BY MR. PAWAR:

8   Q. Thank you.  Do you know what the difference between a

9      prostitute and a non-prostitute is?

10  A. Yes.

11  Q. What is the difference?

12  A. Prostitute is someone that gets paid for having

13     relations and a non-prostitute is a person that does it

14     out of their free will.

15  Q. Do you know if Ms. Reid was a prostitute?

16  A. She stated she was.

17  Q. When did she tell you this?

18  A. She worked for an escort service in Queens.

19  Q. Right.  When did she tell you this?

20  A. A month after she was activated.

21  Q. So approximately November of 2017?

22  A. Yes.

23  Q. And did you relay that information to anyone?

1       A. No.

2       Q. Do you know if prostitution is legal or illegal in New

3          York?

4              MR. TILL:  Objection as to form.  Go ahead and

5          answer it.

6              THE WITNESS:  Illegal.

7

8       BY MR. PAWAR:

9       Q. You know knew after a month after you signed her up

10         that she was engaging in illegal activities?

11             MR. TILL:  Objection as to form.  Go ahead and

12         answer it.

13             THE WITNESS:  That's what she stated she did, but

14         she also stated she was a stripper, so no one could

15         believe which one she was or if she even worked.

16

17      BY MR. PAWAR:

18      Q. Well, you told me about this escort agency in Queens.

19         What's the name of it?

20      A. I don't know the name.

21      Q. So was she or was she not, to your understanding, a

22         prostitute?

23             MR. TILL:  Objection as to form.

```
 1              THE WITNESS:  I'm going by what she told me.

 2

 3      BY MR. PAWAR:

 4      Q. And she told you she was a prostitute?

 5      A. She told me she was a stripper, then she told me she

 6         worked for an escort service.

 7      Q. As a prostitute?

 8      A. She said she got paid for work.

 9      Q. And what kind of work did she tell you about?

10      A. Relationships with men.

11      Q. Sexual relationships?

12      A. Yes.

13      Q. And it's your testimony that you never told anyone

14         about this; correct?

15      A. No, to my knowledge, never told anyone.

16      Q. Had you told someone about it, what do you think would

17         have happened?

18              MR. TILL:  Objection as to form, speculation.  Go

19         ahead and try and answer it.

20              THE WITNESS:  I would not know what would happen.

21

22      BY MR. PAWAR:

23      Q. You don't know what would happen if a CI that you're
```

1    working with comes across as somebody who may be

2    illegal, engaging in illegal activity, you would not

3    know what would happen to that person or to you if you

4    reported it to your supervisors?

5        MR. TILL:  Objection as to form.  Go ahead and

6    answer it.

7        THE WITNESS:  Most of the time a confidential

8    informant is already doing something illegal, that's

9    why they become confidential informants, so that they

10    don't get in trouble again or they don't get arrested

11    again or they're getting paid through the city for

12    their illegal activity of helping an agency.

13        MR. PAWAR:  Could you repeat my last question,

14    please?

15        THE WITNESS:  Can the court stenographer repeat it,

16    please?

17        MR. PAWAR:  No, he's going to do it.

18        (Whereupon, the reporter read back the question.)

19

20  BY MR. PAWAR:

21  Q. Could you answer my question, Detective?

22  A. I do not know what would happen.

23  Q. If you found out that your CI was engaging in illegal

1       activity, what type of responsibilities do you have?

2          MR. TILL:  Objection as to form.  Go ahead and

3       answer the question.

4          THE WITNESS:  I do not know because most

5       confidential informants are doing illegal activity.

6

7   BY MR. PAWAR:

8   Q. So you personally would not do anything about the fact

9       that a CI was engaging in illegal activity?

10  A. To my knowledge, no.

11  Q. Who is the person who supervised your contacts with the

12      CI?

13  A. It would be Lieutenant Bannon.

14  Q. And what type of supervision did he give you when it

15      came to contacting the CI?

16  A. It was just told read the patrol guide and that was

17      it.

18  Q. And did he make sure that the patrol guide was -- that

19      you read the patrol guide?

20  A. I do not know.

21  Q. Well, what would you do after you read the patrol

22      guide, would you sign an affidavit saying I read the

23      patrol guide?

GREGORY HOWARD -- BY MR. PAWAR -- 10/26/2022        52

1      A. No.

2      Q. Then you would just tell him verbally that I read the

3         patrol guide?

4      A. If asked, I would have read it and told him.

5      Q. And if he didn't ask, you didn't volunteer?

6      A. No.

7      Q. And you had said earlier that when you started working

8         as a detective in 2017, you were not aware of any

9         training materials with respect to CIs?

10     A. No, I was not.

11     Q. Did you ever come to learn about any training materials

12        with respect to CIs?

13     A. No.

14     Q. To this day, you still don't know about training

15        materials with respect to CIs?

16     A. Just the patrol guide.

17     Q. Besides the patrol guide?

18     A. I don't know of any.

19     Q. Besides the patrol guide?

20     A. Besides the patrol guide, I don't know of any.

21     Q. So in 2017 when you became a detective, you were aware

22        of the provisions in the patrol guide with respect to

23        CIs?

1    A. No.

2    Q. When did you first learn about the provisions of the CI

3       in the patrol guide?

4    A. In October 2017.

5    Q. How did you learn about it?

6    A. Read them.

7    Q. Did you read them at home or at the precinct?

8    A. The precinct.

9    Q. Did someone direct you to read them?

10   A. No.

11   Q. You just read them on your free time?

12   A. Yes.

13   Q. And did somebody make sure that you had read them?

14   A. No.

15   Q. So it was just your Scout's honor word that you read

16      them; is that fair?

17          MR. TILL:  Objection as to form.  Go ahead and

18      answer the question.

19          THE WITNESS:  Yes.

20

21   BY MR. PAWAR:

22   Q. And you said you never received any training with

23      respect to CI; correct?

1    A. No.

2    Q. I'm halfway through, I think.  Can we take a --

3       Detective Howard, you want to take a 5, 10 minute

4       break?

5          MR. TILL:  5 minutes will be fine.

6          MR. PAWAR:  So come back in 5 minutes.

7          (Brief pause in proceedings.)

8

9    BY MR. PAWAR:

10   Q. Detective Howard, have you ever been arrested?

11   A. No.

12   Q. Did the department, the NYPD, accuse you of sexual

13      misconduct?

14   A. No.

15   Q. Did they ever discipline you for sexual misconduct?

16   A. No.

17   Q. Did they ever train you after there were allegations

18      made about sexual misconduct?

19   A. No.

20   Q. Did they ever enhance your supervision while somebody

21      was making an allegation about sexual misconduct?

22   A. I was put on probationary dismissal for a year.

23   Q. What year was that?

1    A. 2021.  It was December 2020 to January 2021.

2    Q. And what was that punishment for?

3    A. For the IAB investigation from Ms. Reid.

4    Q. And was she making allegations that you had a sexual

5       relationship with her?

6    A. Yes.

7    Q. And you denied it?

8    A. Yes.

9    Q. And the department didn't believe you, fair to say?

10        MR. TILL:  Say that again, what was that?  The

11       department what?

12

13   BY MR. PAWAR:

14   Q. The department didn't believe you, is that fair to

15       say?

16   A. That the NYPD didn't believe me?

17        MR. TILL:  Objection as to form.  Did the department

18       believe you, what you said.  Objection as to form.  Go

19       ahead and answer.

20        THE WITNESS:  The department didn't believe anyone

21       that I know of.

22

23   BY MR. PAWAR:

1    Q. Why do you think that you were put on probation?

2        MR. TILL:  Objection as to form.

3        THE WITNESS:  Policy and procedure.  Policy and

4        procedure.

5

6    BY MR. PAWAR:

7    Q. You can tell me if you're going to take the Fifth for

8        the next series of questions.  Did you ever have sex

9        with Ms. Reid inside of your car?

10       MR. TILL:  Objection.  Directing client to assert

11       his Fifth Amendment right to remain silent.

12       THE WITNESS:  Fifth amendment.

13

14   BY MR. PAWAR:

15   Q. Did you ever have sex inside Ms. Reid -- inside any

16       car?

17       MR. TILL:  Objection, directing client to assert his

18       Fifth Amendment right to remain silent.

19       THE WITNESS:  Fifth Amendment.

20

21   BY MR. PAWAR:

22   Q. Did you ever have sex with Ms. Reid outside of a

23       vehicle?

1    MR. TILL:  Directing client to assert his Fifth

2    Amendment right to remain silent, entering our

3    objection.

4    THE WITNESS:  Fifth Amendment.

5

6    BY MR. PAWAR:

7    Q. Did you ever have sex with Ms. Reid in a motel room?

8    MR. TILL:  Objection on the grounds of Fifth

9    Amendment.  Directing the client to assert his Fifth

10   Amendment right to remain silent.

11   THE WITNESS:  Fifth Amendment.

12

13   BY MR. PAWAR:

14   Q. Did you ever meet with Ms. Reid inside a bar?

15   A. No.

16   Q. Did you ever have sex with Ms. Reid inside of a bar?

17   MR. TILL:  Objection, directing the client to assert

18   his Fifth Amendment right to remain silent.

19   THE WITNESS:  Fifth Amendment.

20

21   BY MR. PAWAR:

22   Q. Did you ever have sex with Ms. Reid inside a house or a

23   home?

1          MR. TILL:  Objection on the grounds of Fifth

2     Amendment.  Directing the client to assert his Fifth

3     Amendment right to remain silent.

4          THE WITNESS:  Fifth Amendment.

5

6     BY MR. PAWAR:

7     Q. And would you have the same Fifth Amendment on if I

8        asked you whether it was an apartment or a trailer or

9        any sort of dwelling, that -- did you have sex with Ms.

10       Reid?

11         MR. TILL:  Objection as to the form of the question

12       as well as objection on Fifth Amendment grounds.

13       Directing the client to assert his Fifth Amendment

14       right to remain silent.

15         THE WITNESS:  Fifth Amendment.

16

17    BY MR. PAWAR:

18    Q. Has Ms. Reid ever been inside of your car?

19         MR. TILL:  Objection as to form and further, as to

20       the Fifth Amendment.  Directing the client to assert

21       his Fifth Amendment right to remain silent.

22         THE WITNESS:  Fifth Amendment.

23

1    BY MR. PAWAR:

2    Q. Have you ever invited Ms. Reid inside of your car?

3          MR. TILL:  Objection as to the Fifth Amendment.

4      Directing client to assert his Fifth Amendment right to

5      remain silent.

6          THE WITNESS:  Fifth Amendment.

7

8    BY MR. PAWAR:

9    Q. Were you ever in a car alone with Ms. Reid?

10         MR. TILL:  Excuse me, I didn't hear that.  Were you

11     ever in the car along with Ms. Reid, is that the

12     question?

13         MR. PAWAR:  Was he ever in a car alone with Ms.

14     Reid?

15         MR. TILL:  Objection as to form and objection as to

16     the Fifth Amendment, and I'm directing the client to

17     please assert his Fifth Amendment right to remain

18     silent.

19         THE WITNESS:  Fifth Amendment.

20

21   BY MR. PAWAR:

22   Q. Detective Howard, how many times have you been sued as

23     a defendant in a case?

1    A. I know I've been sued.  How many, I don't know.

2    Q. More than five, less than five?

3    A. I do not know.

4    Q. Do you know what year the first time you were a

5       defendant in a lawsuit?

6    A. No.

7        MR. TILL:  Let me object as to form and without

8    leading or anything, I'm just trying a clarification --

9        MR. PAWAR:  I know.

10       MR. TILL:  Are we talking about --

11       MR. PAWAR:  Yes, I --

12       MR. TILL:  -- a civil lawsuit as a police officer or

13   as a civil lawsuit as a civilian, okay?  That's all I

14   want to do so we can move on with this.

15       MR. PAWAR:  Peter, you read my mind.

16

17   BY MR. PAWAR:

18   Q. Detective Howard, have you ever been involved in a

19      lawsuit, not in your capacity as a police officer or a

20      detective?

21   A. No.

22   Q. Okay.  So the only lawsuits that you've been a part of

23      has been while working for the NYPD; fair to say?

1    A. Yes.

2    Q. And you don't remember the first time or how many times

3       you have been sued; is that fair to say?

4    A. It's fair.

5    Q. And do you know what type of allegations were made

6       against you in these lawsuits?

7    A. No.

8    Q. Is there anything that would help you refresh your

9       recollection as to what type of allegations were made

10      against you in these lawsuits?

11   A. If there was documents in front of me.

12   Q. Okay.  Are you familiar with the disciplinary

13      procedures of the NYPD?

14   A. I'm not familiar with them.

15   Q. You're not?  Have you ever been subjected to

16      discipline?

17   A. Yes.

18   Q. How many times?

19   A. Approximately four.

20   Q. Do you remember the first time?

21   A. Yes.

22   Q. What was it for?

23   A. Not shaving.

GREGORY HOWARD -- BY MR. PAWAR -- 10/26/2022          62

1    Q. What year was that?

2    A. 2007.

3    Q. And what was the discipline that was imposed?

4    A. The counterterrorism lieutenant wanted me to get a CD

5       because I showed up to the detail unshaven, but it was

6       warned and admonished.

7    Q. Was it a CD A or a B?

8    A. No CD was given.  It was warned and admonished.

9    Q. That was the first time you were given some sort of a

10      disciplinary thing?

11   A. Yes.

12   Q. What was the second time?

13   A. Second time, I believe in 2012.

14   Q. And what was that for?

15   A. Memo book entries.

16   Q. Did you fail to put a memo book entry?

17   A. Yes.

18   Q. What type of entry were you required to make?

19   A. A corner stop.

20   Q. You didn't fill out a UF-250?

21   A. My partner did, he filled out the 250s for everybody

22      and because he, the City or whomever went after him,

23      they gave us all CDs for not -- each and every one of

1          us putting it in our memo book.

2     Q. And did you get a CD A or B?

3     A. No, warned and admonished.

4     Q. Did you lose any days?

5     A. No.

6     Q. When was the next time you were disciplined?

7     A. Approximately the same year.

8     Q. And what was that for?

9     A. Memo book entries.

10    Q. Another UF-250?

11    A. No.

12    Q. What was this for?

13    A. I was in a unit called SET, which was a Strategic

14         Enforcement Team, and we were going after crew members;

15         well, finding out who the crew members were in the

16         precinct.  And one of the crew members who is the head

17         of the crew, I had ran his license plate and see who it

18         came back to to see if any other cars came back to him.

19         And because we had a SET book that we put everything

20         in, and I didn't put it in my memo book, they said I

21         should have put it in my memo book also.

22    Q. Tell me about this crew, what crew are you talking

23         about?

1  A. Crew?

2  Q. Crew.

3  A. It was a crew -- it's NYPD --

4  Q. A gang, a gang?

5  A. It would be a baby gang.  Like, there would be the real

6     gang and then there will be crews that they would set

7     up their own, maybe say 10 kids from each neighborhood

8     that was doing crime and causing disturbance and they

9     would make their own crews.

10 Q. Okay.  So you were part of this unit called SET who was

11    investigating crews; is that fair to say?

12 A. Yes.

13 Q. And one time that you -- or you thought this person or

14    maybe he was, I have no idea, you thought this

15    individual was a leader of the crew and you ran his

16    license plate?

17 A. Yes.

18 Q. Do you remember the name of this person?

19       MR. TILL:  Objection.  I'm directing the witness not

20    to answer.

21       MR. PAWAR:  We'll mark that for a ruling.

22

23 BY MR. PAWAR:

 1     Q. Do you know if this crew leader ever became a CI?

 2     A. I don't know.

 3     Q. Is there anything that would help you remember?

 4     A. No.

 5     Q. No document would help you remember if this person

 6        became a CI?

 7     A. No, because I wouldn't know.

 8     Q. So when you ran the license plate, you were supposed to

 9        put it in a book so it can be randomly audited;

10        correct?

11     A. Yes.

12     Q. And you didn't do that?

13     A. No, I put it -- no, I put it in the book for the unit

14        which was a SET book.

15     Q. But you just didn't do it in your memo book?

16     A. Yes.

17     Q. And what exactly would you have put in the memo book?

18     A. The plate, the name of the person who was driving the

19        car and the time and the place.

20     Q. Do you know if your memo book is more randomly

21        inspected than the audit book or less?

22          MR. TILL:  Objection as to form.  Go ahead and

23        answer the question.

1          THE WITNESS:  The memo book is the only book that we

2          have.  We don't have an audit book.

3

4     BY MR. PAWAR:

5     Q. When you put down the random audit when you ran the

6          license plate, you put it in a book; right?

7     A. Yeah, that was a book which was the SET book for the

8          SET team.

9     Q. It's called SET book?

10    A. Yes.

11    Q. And where is it kept?

12    A. Now I don't know.  I haven't worked in that unit and

13         that unit no longer is part of the NYPD.

14    Q. Was it at a precinct level?

15    A. Yes.

16    Q. Okay.  So it would be kept at the precinct; fair to

17         say?

18    A. Yes.

19    Q. And would it change every year or it was just a big

20         book that it just could last two or three years?

21    A. It would be a book that would last a couple of years.

22    Q. Thank you.  So what happened with that, with -- in

23         terms of discipline, did you get a CD or no?

1    A. Yes, I got a CD.

2    Q. Was it an A or a B?

3    A. I don't remember if it was an A or a B.

4    Q. Do you know the difference between an A or a B?

5    A. No.

6    Q. Do you know one of them disappears after two years and

7        the other one does not?

8        MR. TILL:  Objection as to form.  Go ahead and

9        answer the question.

10        THE WITNESS:  I do know one is worse than the

11        other.

12

13  BY MR. PAWAR:

14    Q. Would it be fair to say that the one that stays on and

15        does not disappear after two years is more worse than

16        the first one?

17        MR. TILL:  Objection as to form.  Go ahead and

18        answer the question.

19        THE WITNESS:  Yes.

20

21  BY MR. PAWAR:

22    Q. Thank you.  What's the other time that you were

23        disciplined?

1        A. This time.

2        Q. And the allegations were Ms. Reid as a CI made

3           allegations that you had a sexual relationship with

4           her?

5        A. Yes.

6        Q. Did you ever discuss your work with Ms. Reid?

7        A. Day to day work?

8        Q. Yeah.

9        A. No.

10       Q. Did you ever discuss the type of investigations that

11          you were involved in with Ms. Reid?

12       A. No, only her investigations.

13       Q. Did you ever discuss with her that you could have been

14          a target of an investigation?

15           MR. TILL:  Objection as to form.  Go ahead and

16          answer the question.

17           THE WITNESS:  That I would be a target or she would

18          be a target?

19

20    BY MR. PAWAR:

21       Q. That you were a target?

22       A. No.

23       Q. Did you ever tell her that your voice was intercepted

1     on a wire tap?

2    A. Yes.

3    Q. And what was --

4    A. It wasn't my voice.

5    Q. I'm sorry?

6    A. It was not my voice.

7       MR. PAWAR:  Can you repeat my last question, please?

8       (Whereupon, the reporter read back the question.)

9       THE WITNESS:  No.

10

11   BY MR. PAWAR:

12   Q. Was your voice ever intercepted on a wire tap?

13   A. No.

14   Q. So it's your testimony that your voice on an ongoing

15      investigation in a wire tap never existed?

16   A. My voice was never on a wire tap.

17   Q. Besides the IAB, have you been interviewed or

18      questioned by any government agency?

19       MR. TILL:  Objection as to form.  Go ahead and

20      answer the question.

21       THE WITNESS:  No.

22

23   BY MR. PAWAR:

1    Q. You have no -- would you answer me the same if I asked

2       you if any federal agents reached out to you?

3          MR. TILL:  Objection as to form.  Go ahead and

4       answer the question.

5          THE WITNESS:  In regards to this case, no.

6

7    BY MR. PAWAR:

8    Q. Did anybody from the U.S. Attorney's Office in the

9       Eastern District of New York ever reach out to you with

10      respect to this case?

11         MR. TILL:  Objection as to the form.  Go ahead and

12      answer the question.

13         THE WITNESS:  No.

14

15   BY MR. PAWAR:

16   Q. In terms of discipline, do you know what a corruption

17      case is?

18         MR. TILL:  Objection as to form.  Go ahead, if you

19      can answer it.

20         THE WITNESS:  I've heard of them.

21

22   BY MR. PAWAR:

23   Q. Have you ever been accused of being involved in a

1      corruption matter?

2   A. That I know of, no.

3      MR. TILL:  Note my objection to form, please, as to

4      that last question, thank you.

5

6   BY MR. PAWAR:

7   Q. What's your understanding of what a corruption case

8      would be in terms of NYPD disciplinary issues?

9      MR. TILL:  Objection as to form.  Go ahead and

10     answer.

11     THE WITNESS:  My form of corruption would be illegal

12     uses of your job as far as not arresting people you

13     should, doing things with drugs, guns, anything that's

14     illegal that can be harm to a person or harm to the

15     city.

16

17  BY MR. PAWAR:

18  Q. You would agree with me --

19     MR. PAWAR:  I'm sorry, could you repeat that?  Can

20     you -- I completely zoned out.  Mr. Court Reporter, can

21     you repeat that answer, please?

22     (Whereupon, the reporter read back the answer.)

23

1    BY MR. PAWAR:

2    Q. Would you consider using the city's computer for

3       improper purposes --

4       MR. TILL:  Objection as to form.

5       MR. PAWAR:  I haven't finished my question.

6       MR. TILL:  Okay.

7

8    BY MR. PAWAR:

9    Q. Would you consider using department computer for

10      unauthorized purposes as improper?

11      MR. TILL:  Objection as to form and I'm going to

12      instruct the client -- advise client to assert his

13      Fifth Amendment right to remain silent.

14      THE WITNESS:  Fifth Amendment.

15

16    BY MR. PAWAR:

17    Q. Would you think it's improper to use department, not

18      computers, but department resources to do something --

19      withdraw that.

20      Have you ever been accused of associating with

21      criminals?

22      MR. TILL:  Objection as to form.  Go ahead and

23      answer.

1          THE WITNESS:  Yes.

2

3     BY MR. PAWAR:

4     Q. And what were the circumstances of that allegation?

5     A. The allegation was I knew a person's mother.

6     Q. And was the mother the criminal or the person?

7     A. The person.

8     Q. Okay.  So you knew the person's mother?

9     A. Yes.

10    Q. You didn't know the person?

11    A. I knew the person, but I haven't spoke to the person or

12        saw the person in years.

13    Q. Well, when was the last time you saw or spoke with this

14        person?

15          MR. TILL:  Objection as to form.  Go ahead and

16        answer.

17          THE WITNESS:  I haven't spoke to them or saw -- I

18        saw them once I would say 2012 or '13.

19

20    BY MR. PAWAR:

21    Q. You know there was an allegation made that you were

22        associating with criminals?  I mean, this is the

23        allegation you're talking about that you knew the

1          perp's mother?

2     A. What year are you talking about?

3     Q. I'm asking you.  How many times has this happened?

4     A. This was in 2012 and 2018.

5     Q. Okay.  What happened in 2012 -- I'm sorry, what was the

6          allegation in 2012?

7     A. It was -- I don't know the actual allegation.  I know

8          one of them was knowingly and willingly involve

9          yourself with criminals.

10    Q. Okay.  And what did they say that you were doing?

11         MR. TILL:  Objection as to form, go ahead.

12         THE WITNESS:  They were asking if I was associated

13         with this person, and I said I was not associated with

14         the person.  I said before I was a cop, I dated the

15         person's mother.

16

17    BY MR. PAWAR:

18    Q. And that was the end of it?

19    A. No.  They asked do I speak to the mother.  I said I do

20         speak to the mother on occasion, and they asked why do

21         I speak to the mother.  I said because she has sickle

22         cell anemia and she had a heart attack and she was at

23         that time 50.

1    Q. Is she still with us?

2    A. Yes.

3    Q. What is her name?

4    A. Yolanda Daniels-Allen.

5    Q. Does she live in Staten island?

6    A. No.

7    Q. Do you know where she lives?

8    A. I believe Virginia.

9    Q. When was the last time you had contact with her?

10   A. Two months ago.

11   Q. How's her health?

12   A. Fine.

13   Q. How did you contact her, by phone or by email?

14   A. No, she sent me a post on Instagram.

15   Q. And you responded to it?

16   A. Yes.

17        MR. PAWAR:  I'm going to call for production of her

18      contact information.

19

20   BY MR. PAWAR:

21   Q. What about her son's name, what's his name?

22   A. Shatiek Daniels.

23   Q. And when is the last time you had contact with him?

```
1      A. I haven't had contact with him at all.

2      Q. So this was just something that came about and you said

3         I knew this before I was on the police force, I knew

4         this woman because I dated her?

5            MR. TILL:  Objection as to form, go ahead.

6

7   BY MR. PAWAR:

8      Q. Something to that effect?

9      A. What happened in the case was her son was being

10        investigated.  He's part of a gang takedown, and her

11        and her son spoke off and on all the time.  I spoke to

12        her off and on.  I saw her son in the street once or

13        twice and he had just came home from jail.  And I said

14        to her, I said instead of leaving him in New York, you

15        need to take him with you because all he's going to do

16        is end up in jail.

17     Q. So when was the last time you saw the son on the

18        street?

19           MR. TILL:  Objection as to form, go ahead.

20           THE WITNESS:  This was before he got arrested.  He's

21        in jail now for the past 5 to 7 years.

22

23   BY MR. PAWAR:
```

1    Q. So you saw him in 2014, 2015?

2          MR. TILL:  Objection as to form, go ahead.

3          THE WITNESS:  I didn't see him personally.  The last

4      time I saw him was in a courtroom when he was going up

5      into court.  Didn't even speak to him.

6

7    BY MR. PAWAR:

8    Q. And seeing somebody on the street, that was -- did I

9      mishear that?

10   A. Yes, I have not seen him on the street, I personally or

11     saw him out and about.  The last time I saw him, he was

12     going to court.

13   Q. Okay.  Did you ever try to help him out by talking to

14     his mother?

15         MR. TILL:  Objection as to form.

16         THE WITNESS:  No.

17         MR. TILL:  Go ahead and answer the question.

18         THE WITNESS:  No.

19

20   BY MR. PAWAR:

21   Q. You and her never had any communications about if

22     there's anything you can do for her son?

23         MR. TILL:  Objection as to form.  Go ahead and

1       answer.

2           THE WITNESS:  No.

3

4    BY MR. PAWAR:

5    Q. And what happened with that investigation, it was just

6       closed?

7           MR. TILL:  Objection as to form.  Go ahead and

8       answer.

9

10   BY MR. PAWAR:

11   Q. The 2012 investigation?

12   A. That's the one I had the CD for, for running the car

13      that was associated with a crew member.

14   Q. He was part of the crew member -- he was part of the

15      crew, I should say?

16          MR. TILL:  Objection as to form.  Go ahead and

17      answer.

18          THE WITNESS:  His daughter was.

19

20   BY MR. PAWAR:

21   Q. So is this crew made out of males, females or both?

22   A. Both.

23          MR. TILL:  Objection as to form.  Go ahead and

```
 1        answer.

 2

 3     BY MR. PAWAR:

 4     Q. What was the name of his daughter?

 5          MR. TILL:  Objection as to form.  Go ahead and

 6        answer.

 7          THE WITNESS:  Alexis Daniels.

 8

 9     BY MR. PAWAR:

10     Q. And do you know where she lives?

11     A. No.

12     Q. Now, so you ran a plate for whom, for whose benefit?

13     A. My job.

14     Q. And you were investigating your friend's son's

15        daughter?

16     A. No, I was not.

17     Q. Who were you investigating, just the crew?

18     A. Just the crew.

19     Q. And at what point did you learn that the crew that you

20        were investigating had some sort of relationship with

21        your friend?

22          MR. TILL:  Objection as to form.  Go ahead and

23        answer.
```

1          THE WITNESS:  The one who was supposedly the crew

2       leader was dating the daughter.

3

4    BY MR. PAWAR:

5    Q. And you don't remember whose license plate you ran;

6       correct?

7          MR. TILL:  Objection as to form.  Go ahead and

8       answer.

9          THE WITNESS:  The license plate I ran was the crew

10      leader's car.

11

12   BY MR. PAWAR:

13   Q. Who was dating this young lady; correct?

14   A. Yes.

15   Q. And what was the relationship with this young lady and

16      your friend in Virginia?

17          MR. TILL:  Objection as to form.  Go ahead and

18      answer.

19          THE WITNESS:  At that time, it was granddaughter.

20

21   BY MR. PAWAR:

22   Q. And did you know this before you ran the plate?

23   A. No.

1   Q. How many plates did you run with respect to this

2      investigation?

3          MR. TILL:  Objection as to form.  Go ahead and

4      answer.

5          THE WITNESS:  I do not know.

6

7   BY MR. PAWAR:

8   Q. But it just so happens that the one entry that you did

9      not make which you got disciplined for was the

10     boyfriend of your friend's granddaughter; is that fair

11     to say?

12         MR. TILL:  Objection as to form.  Go ahead and

13     answer.

14         THE WITNESS:  Yes.

15

16  BY MR. PAWAR:

17  Q. How many times have you been accused of misusing

18     department property?

19         MR. TILL:  Objection as to form and objection on

20     Fifth Amendment grounds.  Directing the client to

21     assert his Fifth Amendment rights.

22         THE WITNESS:  Plead the Fifth.

23

1    BY MR. PAWAR:

2    Q. Was it more than once you were accused of improperly

3        using department property?

4            MR. TILL:  Same objection, directing the client to

5        assert his Fifth Amendment right to remain silent.

6            THE WITNESS:  Plead the Fifth.

7

8    BY MR. PAWAR:

9    Q. More than twice that you were accused of using

10       improper -- improper use of department property?

11           MR. TILL:  Same objection.  Please -- I'm

12       instructing the client to please assert his Fifth

13       Amendment right to remain silent.

14           THE WITNESS:  Plead the Fifth.

15

16   BY MR. PAWAR:

17   Q. More than five, same question?

18           MR. TILL:  Same objection.  Please -- I'm directing

19       the client to assert his Fifth Amendment right to

20       remain silent.

21           THE WITNESS:  Plead the Fifth.

22

23   BY MR. PAWAR:

```
 1    Q. Is it possible that it was more than 10 that you were
 2       accused of improperly using department property?
 3          MR. TILL:  Mr. Pawar, let me say this, I'm going to
 4       make an objection on the grounds of form, and I believe
 5       that the questioning is now becoming harassing.  I'm
 6       going to direct the client to -- I'm going to recommend
 7       to the client he assert his Fifth Amendment right to
 8       remain silent.  Go ahead, Mr. Howard, go ahead.
 9          THE WITNESS:  Plead the Fifth.
10
11    BY MR. PAWAR:
12    Q. How many times have you been accused of improperly
13       using a CI?
14    A. Just this time.
15    Q. There have been no other allegations of you misusing a
16       CI before?
17    A. No, sir.
18    Q. And I take it you haven't had, you haven't had any
19       complaints since then; fair to say?
20    A. Fair to say.
21    Q. Was there any allegations made against you about having
22       a relationship with a woman who was not a prostitute?
23          MR. TILL:  Objection as to form, and I'm directing
```

1       you not to -- directing you to assert your Fifth

2       Amendment right to remain silent.

3               THE WITNESS:  Plead the Fifth.

4

5   BY MR. PAWAR:

6   Q. Do you know if there was more than one situation where

7       a woman had accused you of having a relationship with

8       her?

9   A. No.

10          MR. TILL:  Objection as to form.  Objection with

11      respect to the Fifth Amendment right to remain silent.

12          THE WITNESS:  I plead the Fifth.

13

14  BY MR. PAWAR:

15  Q. Have you ever engaged the services of a prostitute?

16          MR. TILL:  Objection as to form.  I'm directing you

17      not to answer the question.

18          THE WITNESS:  Plead the Fifth.

19

20  BY MR. PAWAR:

21  Q. Have you ever been accused of being engaged in criminal

22      activity while being -- working for the NYPD?

23  A. No.

1    Q. In the years that you were working as a detective, how

2        many times did you have somebody come over, a

3        supervisor come over and supervise your work?

4    A. How many times?

5    Q. Yes.

6    A. I won't be approximate, but it was all the time we had

7        our work supervised.

8    Q. And if there was some sort of irregularity,

9        impropriety, what would the supervisor do?

10        MR. TILL:  Objection as to form, speculation.

11    Please go ahead and answer.

12        THE WITNESS:  They would fix it.

13

14    BY MR. PAWAR:

15    Q. How would they fix it?

16    A. They would do it the proper way.  If you, if you had

17        something wrong, they would tell you how to fix it or

18        they would fix it themselves.

19    Q. Has that ever happened to you?

20    A. Yes.

21    Q. How many times?

22    A. I do not know.

23    Q. More than 5?

GREGORY HOWARD -- BY MR. PAWAR -- 10/26/2022          86

1     A. I do not know.

2     Q. Same answer if I asked you if it was more than 10?

3         MR. TILL:  No, no response to that question, please.

4     Please pose a question, the witness will answer.

5

6     BY MR. PAWAR:

7     Q. You were warned and admonished at least twice; right,

8     one was for not shaving; correct?

9     A. Yes.

10    Q. And your testimony is that you were warned and

11    admonished for not filling out a UF-250?

12    A. Yes.

13    Q. How many other times were you warned and admonished?

14    A. I do not know.

15        MR. PAWAR:  I only have, like, 20 minutes left.  I

16    just have to check my notes, Peter.  Can we take a 10

17    minute break?

18        MR. TILL:  Your deposition.

19        MR. PAWAR:  Well, I just want to make sure it's

20    convenient for Mr. Howard.

21        MR. TILL:  Fine.

22        MR. PAWAR:  All right.  So we'll come back here

23    at 11:50.

1          (Brief pause in proceedings.)

2

3      BY MR. PAWAR:

4      Q. Detective Howard, I apologize if I may have asked you

5          these questions before.  I'm just going through my

6          notes and I don't remember the answers.  So, I asked

7          you the difference between consensual sex and rape.

8          Was your answer the Fifth Amendment or was it something

9          else?

10             MR. TILL:  It was the Fifth Amendment.

11             MR. PAWAR:  Okay.  Thank you.

12             MR. TILL:  If you want to -- by the way, Mr. Pawar,

13         for the record, if you want to have him respond to it

14         again, asserting his Fifth Amendment right to remain

15         silent upon my instruction, I have no problem with

16         that.

17

18     BY MR. PAWAR:

19     Q. You know, just to get it on the record and to clarify,

20         Detective Howard, do you know the difference between

21         consensual sex and rape?

22             MR. TILL:  I'm objecting on the grounds of form and

23         I'm objecting on the grounds of directing my client to

1           assert his Fifth Amendment right to remain silent.

2               THE WITNESS:  Fifth Amendment.

3

4       BY MR. PAWAR:

5       Q. Do you know what consensual sex is?

6               MR. TILL:  Objection as to form and directing my

7           client to assert his Fifth Amendment right to remain

8           silent.

9               THE WITNESS:  Fifth Amendment.

10

11      BY MR. PAWAR:

12      Q. And I know you had taken the Fifth Amendment with

13          respect to sexual relations with Ms. Reid.  Would it be

14          fair to say -- or I can go one by one.  Would it be

15          fair to say that by sexual relations, you also mean to

16          include oral sex, anal sex, and vaginal sex?

17              MR. TILL:  Objection as to form.  I'm directing my

18          client to assert his Fifth Amendment right to remain

19          silent.

20              THE WITNESS:  Fifth Amendment.

21

22      BY MR. PAWAR:

23      Q. Detective Howard, did you ever have oral sex with Ms.

1      Reid?

2           MR. TILL:  Objection as to form.  I'm directing my

3      client to assert his Fifth Amendment right to remain

4      silent.

5           THE WITNESS:  Fifth Amendment.

6

7  BY MR. PAWAR:

8  Q. How about vaginal sex?

9           MR. TILL:  Objection as to form.  I'm directing my

10      client to assert his Fifth Amendment right to remain

11      silent.

12           THE WITNESS:  Fifth Amendment.

13

14  BY MR. PAWAR:

15  Q. Anal sex?

16           MR. TILL:  Objection as to form, directing my client

17      to assert his Fifth Amendment right to remain silent.

18           THE WITNESS:  Fifth Amendment.

19

20  BY MR. PAWAR:

21  Q. Did you ever threaten Ms. Reid that you would expose

22      her if she didn't give in to your sexual demands?

23           MR. TILL:  Objection as to form and I'm directing my

```
 1        client to assert his Fifth Amendment right to remain
 2        silent.
 3            THE WITNESS:  Fifth Amendment.
 4
 5    BY MR. PAWAR:
 6    Q. Do you know if Ms. Reid ever tape recorded your
 7        conversations with her?
 8    A. I don't know.
 9    Q. And if she did and some of your answers today were
10        inconsistent -- I'll withdraw that question.
11            Do you know if Ms. Reid is lying about the fact that
12        she had a sexual relationship with you?
13            MR. TILL:  Objection as to form.  I'm directing the
14        client to assert his Fifth Amendment right to remain
15        silent.
16            MR. PAWAR:  Before you answer, let me just clarify
17        that question.
18            MR. TILL:  You want to withdraw it?
19            MR. PAWAR:  I'll withdraw it, yes.
20            MR. TILL:  Yeah, that's good.
21
22    BY MR. PAWAR:
23    Q. Do you -- is Ms. Reid lying about having a sexual
```

 1          relationship with you and by that, sexual, I mean,

 2          whether it's sex of any kind, or kissing or touching

 3          each other in an inmate manner?

 4              MR. TILL:  Objection as to form.  Mr. Pawar, that's

 5          presupposing that Mr. Howard knows what Ms. Reid said

 6          other than what is in the four corners of the

 7          complaint.  And I'm directing him to assert his Fifth

 8          Amendment right to remain silent.

 9              THE WITNESS:  Fifth Amendment.

10

11      BY MR. PAWAR:

12      Q. You said Lieutenant Bannon was your supervisor while

13          you were a detective; correct, before -- I'm sorry,

14          during this time period from 2017 to 2020

15          approximately?

16      A. No, from 2000 --

17              MR. TILL:  Speak up, please.

18              THE WITNESS:  From 2015 to approximately 2019.

19

20      BY MR. PAWAR:

21      Q. Okay.  And you said you were supervised on a day to day

22          basis?

23      A. Yes, yes, we were.

1    Q. And who was supervising you when you were being accused

2        of improper use of computer and improper use of CI?

3    A. Improper use of computer in 2012, to the best of my

4        knowledge was Lieutenant Bannon.

5    Q. Okay.  So this happened under his supervision?

6        MR. TILL:  Excuse me, just to be corrective, what

7        happened under his supervision?

8        MR. PAWAR:  The 2012 incident that we talked about,

9        computer misuse.

10

11   BY MR. PAWAR:

12   Q. That happened under Lieutenant Bannon's supervision?

13       MR. TILL:  Okay.  Detective Howard, if you can

14       answer that, please go ahead.

15       THE WITNESS:  Yes.

16

17   BY MR. PAWAR:

18   Q. And the other allegations, you said you were verbally

19       advised twice and then you had four complaints lodged

20       against you, all that happened under Lieutenant

21       Bannon's supervision?

22   A. No.

23   Q. Then who was your supervisor on the other times besides

1          Lieutenant Bannon?

2      A. I can't remember back to 2008.

3      Q. No, no, I'm not talking about 2008.  I'm talking about

4          2012 going forward?

5      A. It was Lieutenant Bannon and the other supervisor is --

6          I can't remember my lieutenant after Lieutenant

7          Bannon.

8      Q. Right, but Lieutenant Bannon was your supervisor until

9          2019 to 2020; right?

10     A. Yes, but in between 2012 and 2019 I had a different

11         supervisor when I was in special operations.

12     Q. That was Lieutenant Nicoletti?

13     A. Who?

14     Q. Lieutenant Nicoletti?

15     A. No, Lieutenant Nicoletti is my supervisor now.

16     Q. Okay.  So Lieutenant Bannon was not your supervisor --

17         was not your only supervisor from 2012 to 2020; is that

18         fair to say?

19     A. That's fair to say.

20         MR. TILL:  Objection as to form.  If I may suggest,

21         the testimony's been that Lieutenant Bannon was

22         Detective Howard's supervisor in 2012.  There then came

23         another supervisor due to an assignment into another

```
 1        area.  I think the witness has indicated he does not
 2        recall who that person was, and then Lieutenant
 3        Nicoletti was 2019.  I'm just trying to be of
 4        assistance.
 5
 6    BY MR. PAWAR:
 7    Q. My question was, is it fair to say that between 2012
 8        and 2020 Lieutenant Bannon was not your sole
 9        supervisor?
10    A. Yes.
11    Q. Okay.  And besides Lieutenant Nicoletti, was there
12        somebody else besides Lieutenant Bannon who was your
13        supervisor?
14    A. Lieutenant Nicoletti is my lieutenant now on patrol.
15    Q. I understand that.  Besides Lieutenant Nicoletti and
16        Bannon, was there a third person who was your
17        supervisor between 2012 and 2020?
18    A. Yes.
19    Q. Okay.  How many other people were there, was there a
20        fourth person?
21    A. The only other supervisor I remember as a lieutenant
22        was Lieutenant Faron.
23    Q. Okay.  A sergeant can also be a supervisor; correct?
```

1       A. Yes.

2       Q. Did you have any sergeant supervising you?

3       A. Sergeant Piquette.

4       Q. So now we have four people.  Anybody else that

5          supervised you from 2012 to 2020?

6       A. I can't remember who my sergeant -- were in 2012 to

7          2015.  Wait, one in 2012 was Sergeant Heaps.

8       Q. Did any of these sergeants or lieutenants during the

9          period of 2012 to 2020 direct you to engage in

10         additional training?

11      A. No.

12      Q. Stay on, just give me a minute.  I think I'm done.  Let

13         me just -- just have a couple more questions.

14             You said you had lost 45 days with respect to this

15         incident with Ms. Reid; correct?

16      A. Yes.

17      Q. Did you lose any days for anything else since 2012?

18      A. Only in 2012, I lost three days.

19      Q. Okay.  And were you ever accused of being involved with

20         somebody who was either using or engaged in the sale of

21         illegal drugs?

22      A. No.

23      Q. Who did your annual review from 2012 to 2020?

1    A. Who did my annual review?

2    Q. Yes, or is that a quarterly review?

3    A. It's an annual review, but it would be Lieutenant

4       Bannon, Sergeant Heaps, Lieutenant Faron.  What was the

5       last year, 2000 what?

6    Q. It's okay.  Don't worry about it.

7        MR. PAWAR:  Other than the questions that we marked

8       for ruling and the information that I've requested

9       during this deposition, I have nothing further from

10      Detective Howard, unless there's some questions that I

11      may have to ask him after Mr. Frank is done.  Thank

12      you.

13       MR. FRANK:  Mr. Till, Detective Howard, do you need

14      a break or do you just want to go forward?  I should be

15      brief.

16       MR. TILL:  Let's go forward, please.

17

18                    EXAMINATION

19   BY MR. FRANK:

20   Q. Okay.  Good morning, Detective Howard.  Good afternoon

21      now, Detective Howard.  I just have a couple of

22      follow-up questions.  Earlier you mentioned that you

23      had phone calls with Ms. Reid; right?

1    A. Yes.

2    Q. Did you ever have text messages, exchange text messages

3       with Ms. Reid?

4    A. Yes.

5    Q. In what phone did you use to exchange those text

6       messages?

7    A. My phone.

8    Q. Your personal phone or your department phone?

9    A. My personal phone.  My department phone was broke.

10   Q. And do you still have the same personal phone?

11   A. Yes, I do.

12   Q. You still have those text messages?

13   A. No.

14   Q. Why not?

15   A. I've had two phones since then.

16   Q. I see.  So you don't have the same phone that you had

17      at the time you texted Ms. Reid?

18   A. No.

19   Q. Okay.  Would those text messages be backed up

20      anywhere?

21   A. Not on my phone.

22   Q. Earlier you also testified you met with Ms. Reid in

23      person on a street corner near her house; is that

1       right?

2    A. Yes.

3    Q. Did you notify a supervisor about that meeting ahead of

4       time?

5    A. No.

6    Q. Afterwards?

7    A. I don't recall.

8    Q. Okay.

9       MR. FRANK:  I have nothing further.

10      MR. TILL:  I have nothing, thank you.

11      MR. PAWAR:  Hold on, just two questions.

12

13              RE-EXAMINATION

14  BY MR. PAWAR:

15    Q. Did you get anything in -- Detective Howard, did you

16       get anything in writing from the City of New York

17       stating that they were not going to represent you in

18       this lawsuit?

19    A. From my knowledge, I sent the paperwork to be

20       represented by the State of New York.  I don't ever

21       remember getting back an answer, but through the DEA

22       they had told me that the City of New York wasn't going

23       to represent me.

1     Q. Do you remember who you sent the paperwork to?

2     A. No.

3     Q. And you said you've been through a few phones since the

4        personal phone that you had when you were communicating

5        with Ms. Reid.  Do you have the same phone number?

6     A. Yes.

7     Q. What's that number?

8     A. 347-524-9822.

9     Q. And the department phone number that you have, was it

10       the same as before?

11    A. I believe a 929 number.

12    Q. What is that?

13    A. I don't know it.

14    Q. Okay.

15    A. Offhand I don't know it.  I'd have to look in my

16       phone.

17    Q. Do you have an Apple phone?

18    A. No.

19    Q. And do you have any cars that you drive that are

20       personal cars?

21    A. Yes.

22    Q. What kind of car is it?

23    A. A black SUV.

1    Q. What model?

2    A. Nissan Murano.

3    Q. And were you ever issued a department car when you

4       were -- within 2017 and 2020?

5    A. A personal department car?

6    Q. Well, if it's a -- yeah, sure?

7    A. I was never issued a personal department car.

8    Q. Were you issued a department car?

9    A. We do have department cars we use.

10   Q. And they're undercover, I take it?

11   A. They're unmarked.

12   Q. Unmarked, I apologize.  Okay.

13       MR. PAWAR:  I have nothing further.

14       MR. TILL:  Thank you.  We don't either.

15       (Whereupon, the examination was concluded at 12:10

16       p.m.)

17

18

19

20

21

22

23

1    STATE OF NEW YORK)
             )   ss.
2    COUNTY OF ERIE   )

3

     I, Kelly S. Hairston, Notary Public, in and for the County
4    of Erie, State of New York, do hereby certify:

5

        That the witness whose testimony appears hereinbefore
6    was, before the commencement of their testimony, duly
     sworn to testify the truth, the whole truth and nothing
7    but the truth; that said testimony was taken pursuant to
     notice at the time and place as herein set forth; that
8    said testimony was taken down by me and thereafter
     transcribed into typewriting, and I hereby certify the
9    foregoing testimony is a full, true and correct
     transcription of my shorthand notes so taken.

10

11       I further certify that I am neither counsel for nor
     related to any party to said action, nor in any way
12   interested in the outcome thereof.

13

        IN WITNESS WHEREOF, I have hereunto subscribed my
14   name and affixed my seal this 15th day of November, 2022.

15

16   _Kelly Hairston_

17   Kelly S. Hairston
     Notary Public,
18   State of New York, County of Erie
     My commission expires 08/29/2026.

19

20

21

22

23



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

< Dates >
08/29/2026 101:36
August 2018 36:5
December 2020 55:1
January 2018 35:12
January 2019 37:21
January 2021 55:1
January 31st, 2006 10:15
November, 2022 101:27
October 17th 16:7, 16:11
October 2017 15:16, 15:18, 16:19, 27:2, 53:4
October 26th, 2022 1:21
$1,500 34:16
'13 73:18
'15 26:23
'18 36:6
-vs- 1:7

< 0 >
04 3:5
07081 2:21

< 1 >
1,500 33:23, 34:6, 34:10, 35:15, 37:5
1-5 1:10
10 42:23, 43:6, 54:3, 64:7, 83:1, 86:2, 86:16
10-17 38:6, 39:3

10-27 38:5
100 2:30
10007 2:11, 2:31
105 2:19
10:00 1:23
112 30:23
11:50 86:23
120 15:7, 26:7
120th 15:20, 16:1, 16:2
122 15:23, 31:1
123 30:23, 31:1
12:10 1:23, 100:15
1410 2:10
15 21:7, 22:20
15th 101:27

< 2 >
20 1:7, 2:10, 86:15
2000 91:16, 96:5
2006 10:15, 11:7
2007 62:2
2008 11:13, 11:15, 93:2, 93:3
2012 62:13, 73:18, 74:4, 74:5, 74:6, 78:11, 92:3, 92:8, 93:4, 93:10, 93:17, 93:22, 94:7, 94:17, 95:5, 95:6, 95:7, 95:9, 95:17, 95:18, 95:23
2013 26:23
2014 77:1
2015 77:1, 91:18, 95:7
2017 11:21, 15:1, 15:7, 19:21, 30:20,

36:8, 37:3, 47:21, 52:8, 52:21, 91:14, 100:4
2018 23:1, 36:10, 36:14, 36:17, 37:4, 37:6, 74:4
2019 15:7, 19:7, 19:9, 41:12, 42:7, 91:18, 93:9, 93:10, 94:3
2020 12:11, 15:2, 19:21, 91:14, 93:9, 93:17, 94:8, 94:17, 95:5, 95:9, 95:23, 100:4
2021 55:1
212 2:12, 2:32
250s 62:21
258-0064 2:22

< 3 >
30 5:20, 19:11
347-524-9822 99:8
356-3541 2:32
3926(FB)(PK 1:7

< 4 >
40 19:11
45 31:19, 31:20, 95:14
46 10:22

< 5 >
5 42:23, 43:6, 54:3, 54:5, 54:6, 76:21, 85:23

50 74:23
571-0805 2:12

< 7 >
7 25:18, 76:21

< 8 >
8-18 38:6, 39:3

< 9 >
929 99:11
96 3:6
973 2:22
98 3:7

< A >
able 43:1
accuse 54:12
accused 70:23, 72:20, 81:17, 82:2, 82:9, 83:2, 83:12, 84:7, 84:21, 92:1, 95:19
acknowledge 4:3
across 50:1
action 101:22
activated 47:20
activities 48:10
activity 50:2, 50:12, 51:1, 51:5, 51:9, 84:22
actual 74:7
additional 95:10
administer 4:3
admonished 62:6, 62:8, 63:3, 86:7, 86:11, 86:13
advise 72:12
advised 92:19

affairs 6:11, 21:14, 22:5, 24:8, 24:12
affidavit 51:22
affirmative 34:21
affixed 101:27
afternoon 96:20
Afterwards 98:6
age 10:21
Agency 8:8, 48:18, 50:12, 69:18
agents 70:2
ago 42:18, 75:10
agree 21:23, 71:18
agreement 4:6, 4:7
Alexis 79:7
allegation 46:4, 54:21, 73:4, 73:5, 73:21, 73:23, 74:6, 74:7
allegations 54:17, 55:4, 61:5, 61:9, 68:2, 68:3, 83:15, 83:21, 92:18
allowed 17:6
alone 59:9, 59:13
already 50:8
Anal 88:16, 89:15
anemia 74:22
annual 95:23, 96:1, 96:3
answer. 71:22
answering 42:11
answers 87:6, 90:9
Anybody 40:13, 70:8, 95:4

anytime 38:9
apartment 27:23, 28:1, 28:6, 28:10, 32:18, 32:19, 32:20, 58:8
apologize 7:15, 17:1, 43:7, 44:17, 87:4, 100:12
APPEARING 1:17, 1:30, 2:6, 2:15, 2:24
appears 101:10
Apple 99:17
approach 21:8, 21:10, 21:15, 21:18, 21:20
approximate 27:16, 85:6
Approximately 5:20, 6:2, 12:9, 15:2, 19:7, 19:21, 21:5, 22:2, 22:4, 33:22, 36:8, 36:10, 41:16, 47:21, 61:19, 63:7, 91:15, 91:18
area 43:18, 94:1
around 36:9, 37:3
arrest 24:10, 24:11, 25:6
arrested 23:14, 23:17, 23:20, 50:10, 54:10, 76:20
arresting 71:12
assert 44:2, 45:3, 45:5, 45:22, 46:6, 46:18, 47:3, 56:10, 56:17, 57:1, 57:9,

57:17, 58:2, 58:13, 58:20, 59:4, 59:17, 72:12, 81:21, 82:5, 82:12, 82:19, 83:7, 84:1, 88:1, 88:7, 88:18, 89:3, 89:10, 89:17, 90:1, 90:14, 91:7
asserting 87:14
assigned 12:16
assignment 13:14, 15:5, 26:11, 93:23
assignments 15:9, 15:10
assistance 94:4
ASSISTANT 2:28
associated 74:12, 74:13, 78:13
associating 72:20, 73:22
Association 8:2
attack 74:22
Attorney 4:8, 6:22, 8:4, 8:17, 70:8
attorneys 4:2
audit 65:21, 66:2, 66:5
audited 65:9
August 36:10
Avenue 2:19, 7:5, 7:7
awarded 32:21
aware 25:6, 31:2, 52:8, 52:21

< B >
baby 64:5
back 24:12,

24:13, 38:20, 50:18, 54:6, 63:18, 69:8, 71:22, 86:22, 93:2, 98:21
backed 97:19
background 29:19
Bannon 25:12, 25:13, 29:12, 29:13, 34:6, 34:10, 35:1, 51:13, 91:12, 92:4, 92:12, 92:21, 93:1, 93:5, 93:7, 93:8, 93:16, 93:21, 94:8, 94:12, 94:16, 96:4
bar 44:15, 44:20, 57:14, 57:16
basically 10:13
basis 91:22
became 21:9, 22:11, 23:19, 25:6, 52:21, 65:1, 65:6
become 12:9, 12:10, 14:9, 21:13, 27:21, 50:9
becoming 15:14, 83:5
beginning 7:14
believe 6:15, 36:5, 41:6, 48:15, 55:9, 55:14, 55:16, 55:18, 55:20, 62:13, 75:8, 83:4, 99:11
below 12:5, 12:6
benefit 79:12
Besides 7:9, 7:12, 8:8,

19:22, 20:7,
23:2, 33:2,
35:7, 52:17,
52:19, 52:20,
69:17, 92:23,
94:11, 94:12,
94:15
best 92:3
big 66:19
black 99:23
blue 28:3
book 62:15,
62:16, 63:1,
63:9, 63:19,
63:20, 63:21,
65:9, 65:13,
65:14, 65:15,
65:17, 65:20,
65:21, 66:1,
66:2, 66:6,
66:7, 66:9,
66:20, 66:21
boyfriend 81:10
break 6:21, 7:2,
54:4, 86:17,
96:14
Brennan 29:11
Brief 54:7,
87:1, 96:15
broke 97:9
brought 5:4
Brown 28:2,
28:6, 28:9,
28:14, 37:2
bureau 14:5,
15:3, 26:1
burner 40:19,
41:2, 41:4,
41:7

< C >
C-o-o-p 33:8, 33:9
call 21:19,
21:22, 37:22,
38:14, 38:16,

39:7, 39:17,
40:1, 41:18,
41:19, 42:13,
43:2, 75:17
called 24:11,
24:13, 24:22,
40:7, 63:13,
64:10, 66:9
calling 39:8
calls 41:17,
42:11, 42:22,
96:23
capacity 60:19
Captain 26:6
car 56:9, 56:16,
58:18, 59:2,
59:9, 59:11,
59:13, 65:19,
78:12, 80:10,
99:22, 100:3,
100:5, 100:7,
100:8
cars 63:18,
99:19, 99:20,
100:9
case 5:7, 5:12,
7:12, 9:13,
10:1, 10:11,
17:22, 33:16,
59:23, 70:5,
70:10, 70:17,
71:7, 76:9
cases 21:17,
22:8, 29:21
Cash 32:9,
33:20, 33:21,
34:16, 35:2
causing 64:8
CD 62:4, 62:7,
62:8, 63:2,
66:23, 67:1,
78:12
Cds 62:23
cell 74:22
certain 43:2
certify 101:7,

101:16, 101:21
change 66:19
check 29:19,
33:20, 86:16
choice 18:18,
18:21
Christmas 45:11,
45:13
Church 2:30
circumstances
27:3, 27:5,
36:15, 37:8,
73:4
Cis 17:4, 17:18,
19:23, 32:9,
41:4, 44:8,
52:9, 52:12,
52:15, 52:23
citizen 23:8
City 1:8, 1:18,
2:24, 2:26,
4:1, 4:13,
5:4, 8:21,
9:2, 9:6, 9:8,
50:11, 62:22,
71:15, 72:2,
98:16, 98:22
Citywide 34:12,
34:14, 34:16
civil 5:12,
60:12, 60:13
civilian 60:13
clarification
60:8
clarify 87:19,
90:16
client 36:19,
45:3, 45:22,
46:6, 46:17,
47:3, 56:10,
56:17, 57:1,
57:9, 57:17,
58:2, 58:13,
58:20, 59:4,
59:16, 72:12,
81:20, 82:4,

82:12, 82:19,
83:6, 83:7,
87:23, 88:7,
88:18, 89:3,
89:10, 89:16,
90:1, 90:14
closed 78:6
comes 16:4,
28:4, 50:1
commencement
101:11
commission
101:36
communicating
99:4
communication
41:11
communications
77:21
compensated
22:17
complained 13:14
complaint 8:20,
25:9, 91:7
complaints
83:19, 92:19
completely 71:20
computer 72:2,
72:9, 92:2,
92:3, 92:9
computers 72:18
concerned 9:16,
9:17
concluded 100:15
conference 8:19,
9:21
confidential
15:14, 16:4,
17:16, 30:4,
50:7, 50:9,
51:5
conflict 24:14,
24:15
consensual
45:20, 87:7,
87:21, 88:5

consent 4:4, 4:10, 4:12, 4:14
consider 18:7, 72:2, 72:9
considering 18:7
contact 17:18, 17:21, 37:16, 37:19, 75:9, 75:13, 75:18, 75:23, 76:1
contacting 35:2, 51:15
contacts 51:11
context 10:21
convenient 86:20
conversation 37:23, 42:5, 43:4
conversations 90:7
Cop 33:5, 33:7, 33:8, 74:14
corner 40:3, 40:5, 40:6, 62:19, 97:23
corners 91:6
CORPORATION 2:28
corporation/unit 26:19
Correct 5:1, 13:15, 14:20, 15:3, 15:18, 18:19, 23:3, 29:8, 29:9, 36:3, 41:12, 49:14, 53:23, 65:10, 80:6, 80:13, 86:8, 91:13, 94:23, 95:15, 101:17
Corrections 11:4
corrective 92:6
corruption 70:16, 71:1, 71:7, 71:11

COUNSEL 2:28, 101:21
counterterrorism 62:4
County 1:30, 101:3, 101:6, 101:35
couple 66:21, 95:13, 96:21
Court 1:1, 50:15, 71:20, 77:5, 77:12
courtroom 77:4
Crew 63:14, 63:15, 63:16, 63:17, 63:22, 64:1, 64:2, 64:3, 64:15, 65:1, 78:13, 78:14, 78:15, 78:21, 79:17, 79:18, 79:19, 80:1, 80:9
crews 64:6, 64:9, 64:11
crime 15:11, 33:18, 64:8
criminal 31:23, 73:6, 84:21
criminals 72:21, 73:22, 74:9
CV 1:7

< D >
DA 7:15
Daniels 75:22, 79:7
Daniels-allen 75:4
date 27:16, 46:12, 46:14
dated 74:14, 76:4
dating 80:2, 80:13

daughter 78:18, 79:4, 79:15, 80:2
Day 52:14, 68:7, 91:21, 101:27
days 31:19, 31:20, 63:4, 95:14, 95:17, 95:18
DEA 7:14, 7:16, 7:17, 7:19, 8:22, 9:3, 9:4, 13:12, 98:21
deactivate 20:10, 21:9, 22:5, 23:13, 24:14, 25:4, 46:11
deactivated 35:23, 36:4, 36:11, 38:3, 41:14
dealing 16:11
decision 17:17
declined 9:3
decrease 12:12
DEFENDANT 2:15, 2:24, 5:14, 59:23, 60:5
Defendants 1:13
delegate 8:11, 8:15
delivered 34:1
demands 89:22
demotion 18:7
denied 55:7
Department 2:26, 11:4, 23:11, 31:4, 31:10, 54:12, 55:9, 55:11, 55:14, 55:17, 55:20, 72:9, 72:17, 72:18, 81:18, 82:3, 82:10,

83:2, 97:8, 97:9, 99:9, 100:3, 100:5, 100:7, 100:8, 100:9
deposed 5:5, 5:8
deposition 4:3, 7:9, 9:11, 9:14, 9:18, 86:18, 96:9
derogatories 10:5
describe 37:8
DESCRIPTION 3:12
designation 13:22, 14:14
desire 18:17
detail 62:5
Detectives 8:1
Developmental 10:17
difference 14:1, 45:19, 47:8, 47:11, 67:4, 87:7, 87:20
different 93:10
direct 53:9, 83:6, 95:9
Directing 20:3, 46:17, 47:2, 56:10, 56:17, 57:1, 57:9, 57:17, 58:2, 58:13, 58:20, 59:4, 59:16, 64:19, 81:20, 82:4, 82:18, 83:23, 84:1, 84:16, 87:23, 88:6, 88:17, 89:2, 89:9, 89:16, 89:23, 90:13, 91:7
Disability 10:17
disappear 67:15
disappears 67:6

disciplinary 61:12, 62:10, 71:8
discipline 54:15, 61:16, 62:3, 66:23, 70:16
disciplined 63:6, 67:23, 81:9
discuss 7:9, 7:21, 8:9, 8:19, 68:6, 68:10, 68:13
discussed 7:12, 7:19
dismissal 54:22
disparage 33:7
dispensing 32:9
District 1:1, 1:2, 70:9
disturbance 64:8
DIVISION 2:27
document 19:15, 65:5
Documents 6:9, 9:11, 9:13, 9:17, 9:20, 9:22, 10:1, 10:4, 10:11, 61:11
doing 14:5, 22:15, 26:9, 50:8, 51:5, 64:8, 71:13, 74:10
Domestic 15:12, 23:16, 23:18, 23:20, 23:21, 27:4, 27:7, 27:8, 27:14, 27:18, 28:4
done 5:23, 14:7, 24:12, 35:14, 95:12, 96:11
down 66:5,

101:15
drawn 32:19
drive 99:19
driving 65:18
drove 39:18
Drug 8:7
drugs 71:13, 95:21
due 32:21, 93:23
duly 4:17, 101:11
duration 42:22
during 15:5, 91:14, 95:8, 96:9
duty 39:23
DV 28:4
dwelling 58:9

< E >
Earlier 52:7, 96:22, 97:22
Eastern 1:2, 70:9
effect 76:8
either 33:8, 95:20, 100:14
email 37:17, 75:13
Emails 10:7, 10:8
employed 10:16
encounter 16:19
encounters 45:1
end 11:11, 35:20, 74:18, 76:16
ended 11:13, 42:7
Endowment 8:1
Enforcement 8:8, 20:19, 63:14
engage 21:3, 95:9
engaged 84:15,

84:21, 95:20
engaging 48:10, 50:2, 50:23, 51:9
enhance 54:20
enlisted 36:9
entering 57:2
entries 62:15, 63:9
entry 62:16, 62:18, 81:8
equivalent 12:6
Erie 1:30, 101:3, 101:7, 101:35
escort 47:18, 48:18, 49:6
ESQ 2:9, 2:18, 2:29
establishment 40:3
everybody 62:21
everything 15:11, 63:19
exactly 65:17
EXAMINATION 1:16, 3:3, 4:20, 96:18, 100:15
examined 4:17
exchange 45:16, 97:2, 97:5
Excuse 59:10, 92:6
EXHIBITS 3:11, 3:14
existed 69:15
expires 101:36
expose 89:21

< F >
F-o-n-g 25:2
fact 51:8, 90:11
fail 62:16
Fair 15:1,

15:17, 34:17, 36:8, 43:10, 43:12, 43:13, 43:14, 43:17, 53:16, 55:9, 55:14, 60:23, 61:3, 61:4, 64:11, 66:16, 67:14, 81:10, 83:19, 83:20, 88:14, 88:15, 93:18, 93:19, 94:7
familiar 61:12, 61:14
family 22:20
far 71:12
Faron 94:22, 96:4
FEDERAL 2:27, 70:2
felt 6:17
female 7:21, 21:1
females 78:21
few 99:3
figure 8:21, 29:4
figured 39:22
file 12:22, 35:4
fill 62:20
filled 62:21
filling 86:11
find 6:7, 28:5, 28:16
finding 63:15
Fine 54:5, 75:12, 86:21
finished 72:5
firearm 23:6, 32:20, 32:21
First 4:17, 16:8, 16:11, 16:19, 16:22, 16:23, 17:2, 21:3, 27:1,

27:5, 53:2,
60:4, 61:2,
61:20, 62:9,
67:16
**Five** 6:2, 40:10,
60:2, 82:17
**fix** 85:12,
85:15, 85:17,
85:18
**follow-up** 96:22
**follows** 4:18
**Fong** 25:2
**force** 76:3
**foregoing** 101:17
**forth** 101:14
**forward** 45:8,
93:4, 96:14,
96:16
**forwarded** 29:1
**found** 13:2,
30:13, 31:14,
32:20, 35:14,
36:17, 50:23
**four** 61:19,
91:6, 92:19,
95:4
**fourth** 94:20
**Frank** 2:29, 3:6,
4:13, 10:9,
96:11
**free** 47:14,
53:11
**friend** 22:16,
22:19, 23:7,
27:17, 79:14,
79:21, 80:16,
81:10
**friendly** 42:4
**front** 19:15,
61:11
**full** 101:17

**< G >**
**gamut** 15:12
**gang** 22:14,

23:5, 64:4,
64:5, 64:6,
76:10
**gave** 6:16,
21:17, 23:2,
23:5, 32:1,
34:6, 37:2,
62:23
**gets** 47:12
**getting** 19:8,
19:13, 43:18,
50:11, 98:21
**Ghost** 40:15,
40:16
**gifts** 45:11,
45:13, 45:16
**Give** 6:14, 6:20,
12:18, 14:14,
19:11, 21:19,
22:13, 23:6,
33:17, 34:16,
35:13, 51:14,
89:22, 95:12
**given** 8:20,
14:7, 14:8,
22:7, 22:9,
35:14, 35:16,
37:1, 37:4,
41:4, 41:7,
62:8, 62:9
**GO-14** 5:23
**GO-15** 5:23
**Goodhue** 39:12
**goods** 26:20
**Gos** 6:9
**government** 69:18
**grade** 11:22,
12:1, 12:3,
12:5, 14:1,
14:4, 14:12,
14:18, 15:2,
15:18, 16:3
**grader** 12:7
**graffiti** 26:11,
26:12
**grand** 5:20

**granddaughter**
80:19, 81:10
**granted** 14:6
**Greg** 8:16, 8:17
**GREGORY** 1:9,
1:16, 2:15,
3:4, 4:16
**grievance** 12:22
**grounds** 57:8,
58:1, 58:12,
81:20, 83:4,
87:22, 87:23
**guess** 27:11
**guide** 16:16,
16:17, 51:16,
51:18, 51:19,
51:22, 51:23,
52:3, 52:16,
52:17, 52:19,
52:20, 52:22,
53:3
**Gun** 27:22, 28:1,
28:5, 28:10,
29:2, 29:5,
29:7, 32:10,
32:11, 32:14,
32:16, 32:18,
32:23, 33:2,
33:19, 34:11,
35:3, 35:13,
35:14, 36:17,
37:2, 38:14,
38:16, 39:5,
39:7, 39:8,
40:1, 40:7
**guns** 40:15,
40:16, 71:13

**< H >**
**Hairston** 1:29,
101:6, 101:33
**halfway** 54:2
**hand** 34:1
**hang** 31:3
**happen** 49:20,

49:23, 50:3,
50:22
**happened** 8:23,
30:14, 31:14,
31:18, 49:17,
66:22, 74:3,
74:5, 76:9,
78:5, 85:19,
92:5, 92:7,
92:12, 92:20
**happens** 31:10,
81:8
**happy** 12:20
**harassing** 83:5
**harm** 71:14
**head** 63:16
**health** 75:11
**Heaps** 95:7, 96:4
**hear** 6:12,
44:16, 59:10
**heard** 40:18,
40:22, 70:20
**heart** 74:22
**help** 6:7, 61:8,
65:3, 65:5,
77:13
**helping** 50:12
**hereby** 101:7,
101:16
**herein** 101:14
**hereinbefore**
101:10
**hereunto** 101:26
**higher** 17:17
**history** 29:20
**Hold** 98:11
**Hollywood** 26:6
**home** 40:11,
53:7, 57:23,
76:13
**honor** 53:15
**hours** 19:11,
19:12
**house** 29:2,
37:2, 39:17,
39:18, 39:19,

57:22, 97:23
Howard 1:9,
   1:16, 2:15,
   3:4, 4:12,
   4:16, 4:22,
   6:12, 19:16,
   20:23, 35:1,
   37:1, 38:22,
   42:15, 43:23,
   44:2, 44:7,
   45:9, 54:3,
   54:10, 59:22,
   60:18, 83:8,
   86:20, 87:4,
   87:20, 88:23,
   91:5, 92:13,
   93:22, 96:10,
   96:13, 96:20,
   96:21, 98:15

< I >
IAB 10:11,
   21:10, 24:19,
   24:22, 25:3,
   30:10, 31:15,
   35:4, 55:3,
   69:17
idea 21:12,
   64:14
illegal 48:2,
   48:6, 48:10,
   50:2, 50:8,
   50:12, 50:23,
   51:5, 51:9,
   71:11, 71:14,
   95:21
imposed 62:3
improper 72:3,
   72:10, 72:17,
   82:10, 92:2,
   92:3
improperly 82:2,
   83:2, 83:12
impropriety 85:9
incident 23:18,

23:21, 27:7,
   27:9, 27:14,
   28:4, 92:8,
   95:15
include 88:16
inconsistent
   90:10
increase 12:12
INDEX 1:7
indicate 4:6
indicated 94:1
individual 20:7,
   21:12, 21:19,
   64:15
individuals 25:3
informant 29:8,
   30:5, 50:8
informants
   15:15, 16:5,
   17:16, 50:9,
   51:5
information 6:8,
   21:17, 22:8,
   22:13, 23:2,
   23:5, 28:23,
   33:14, 33:17,
   35:18, 37:3,
   47:23, 75:18,
   96:8
inmate 91:3
inside 56:9,
   56:15, 57:14,
   57:16, 57:22,
   58:18, 59:2
inspected 65:21
Instagram 75:14
instead 76:14
instruct 44:2,
   45:3, 72:12
instructing
   45:21, 46:6,
   82:12
instruction
   87:15
intelligence
   18:4

interaction 40:9
intercepted
   68:23, 69:12
interested
   101:23
Internal 6:11,
   21:14, 22:5,
   24:8, 24:11
interrogatories
   10:5
interviewed
   69:17
interviewing
   27:12, 28:3
investigated
   76:10
investigating
   64:11, 79:14,
   79:17, 79:20
investigation
   15:11, 21:11,
   23:23, 24:4,
   30:11, 31:15,
   55:3, 68:14,
   69:15, 78:5,
   78:11, 81:2
investigations
   68:10, 68:12
investigative
   14:5
investigator
   12:7
investigatory
   18:4
invited 59:2
invoke 43:20,
   44:12
involve 74:8
involved 15:8,
   15:14, 21:11,
   22:14, 60:18,
   68:11, 70:23,
   95:19
irregularity
   85:8
Island 10:17,

10:18, 22:21,
   75:5
issued 100:3,
   100:7, 100:8
issues 71:8

< J >
jail 76:13,
   76:16, 76:21
JANE 1:10
January 37:4,
   41:11, 42:7
Jeffrey 2:29,
   4:13, 10:9
Jersey 2:20
Jim 7:23, 8:4,
   8:8, 8:12,
   8:13, 13:11
job 17:15,
   18:19, 27:12,
   71:12, 79:13
jobs 26:9
JOHN 1:10
judge 20:16
jury 5:20

< K >
Kelly 1:29,
   101:6, 101:33
kept 66:11,
   66:16
kids 11:2, 64:7
kind 30:3, 49:9,
   91:2, 99:22
kissing 91:2
knowingly 31:22,
   31:23, 74:8
knowledge 29:7,
   49:15, 51:10,
   92:4, 98:19
known 21:4,
   21:16, 31:23
knows 91:5

**< L >**

L-e-a-d-s 26:16
lady 25:4,
  80:13, 80:15
larceny 26:20
last 17:9,
  22:23, 25:1,
  26:11, 30:17,
  36:13, 36:16,
  37:5, 37:13,
  37:19, 38:17,
  40:9, 41:13,
  43:4, 50:13,
  66:20, 66:21,
  69:7, 71:4,
  73:13, 75:9,
  75:23, 76:17,
  77:3, 77:11,
  96:5
LAW 2:8, 2:17,
  2:26, 20:19
Lawrence 28:2
lawsuit 5:4,
  7:19, 8:9,
  60:5, 60:12,
  60:13, 60:19,
  98:18
lawsuits 60:22,
  61:6, 61:10
lawyer 6:23,
  9:21, 13:12,
  45:10
leader 64:15,
  65:1, 80:2,
  80:10
leading 60:8
Leads 26:11,
  26:13, 26:14,
  26:19
learn 52:11,
  53:2, 53:5,
  79:19
least 86:7
leaving 76:14
left 26:1, 41:9,

86:15
legal 48:2
less 60:2, 65:21
level 18:3,
  34:16, 66:14
license 63:17,
  64:16, 65:8,
  66:6, 80:5,
  80:9
Lieutenant
  24:23, 25:12,
  25:13, 26:5,
  29:1, 29:10,
  34:5, 34:6,
  34:10, 35:1,
  51:13, 62:4,
  91:12, 92:4,
  92:12, 92:20,
  93:1, 93:5,
  93:6, 93:8,
  93:12, 93:14,
  93:15, 93:16,
  93:21, 94:2,
  94:8, 94:11,
  94:12, 94:14,
  94:15, 94:21,
  94:22, 96:3,
  96:4
lieutenants 95:8
life 41:22, 42:2
likely 14:4
listen 41:23
LITIGATION 2:27
live 7:7, 28:17,
  75:5
lives 22:21,
  75:7, 79:10
living 7:4, 28:9
Livingston 7:7
location 39:20
lodged 92:19
long 7:4, 21:16,
  22:2, 22:19,
  40:9, 42:22
longer 66:13
look 13:18,

13:19, 99:15
lose 63:4, 95:17
lost 30:16,
  30:22, 95:14,
  95:18
lying 90:11,
  90:23


**< M >**

male 7:21
males 78:21
manner 4:5, 91:3
mark 20:15,
  20:20, 64:21
MARKED 3:14,
  96:7
married 10:23
materials 52:9,
  52:11, 52:15
matter 71:1
mean 8:1, 16:8,
  26:18, 27:5,
  32:17, 33:7,
  39:6, 39:8,
  73:22, 88:15,
  91:1
means 45:9
meet 27:1,
  38:11, 39:4,
  39:19, 44:15,
  44:20, 57:14
meeting 27:3,
  39:9, 98:3
member 78:13,
  78:14
members 22:14,
  23:6, 63:14,
  63:15, 63:16
Memo 62:15,
  62:16, 63:1,
  63:9, 63:20,
  63:21, 65:15,
  65:17, 65:20,
  66:1
men 49:10

mentioned 96:22
messages 97:2,
  97:6, 97:12,
  97:19
met 4:23, 37:9,
  37:10, 39:23,
  40:6, 97:22
mind 60:15
minute 43:5,
  54:3, 86:17,
  95:12
minutes 40:10,
  42:23, 43:6,
  54:5, 54:6,
  86:15
misconduct
  54:13, 54:15,
  54:18, 54:21
mishear 77:9
misheard 43:7
misplace 31:10
missing 31:20,
  31:21
misuse 92:9
misusing 81:17,
  83:15
model 100:1
moment 17:15
money 30:6,
  30:8, 30:10,
  32:1, 32:11,
  32:14, 32:16,
  32:21, 32:23,
  33:2, 33:5,
  33:19, 34:3,
  34:8, 35:6,
  35:16
monitor 26:19
month 19:11,
  22:5, 22:9,
  23:3, 23:20,
  24:1, 47:20,
  48:9
months 75:10
morning 9:17,
  96:20

Morris 2:19
Moschella 7:23,
  8:12, 8:13,
  13:11
motel 57:7
mother 73:5,
  73:6, 73:8,
  74:1, 74:15,
  74:19, 74:20,
  74:21, 77:14
move 30:21,
  60:14
moving 30:15
MR. FRANK 4:13,
  20:18, 96:13,
  96:19, 98:9
Murano 100:2
Myself 30:18

< N >
name 4:6, 4:22,
  8:15, 20:2,
  20:17, 25:1,
  48:19, 48:20,
  64:18, 65:18,
  75:3, 75:21,
  79:4, 101:27
nature 41:17
near 97:23
necessarily
  14:17
need 6:20, 6:22,
  7:2, 8:7,
  76:15, 96:13
neighborhood
  64:7
neither 101:21
New 1:2, 1:8,
  1:18, 1:30,
  2:11, 2:20,
  2:24, 2:26,
  2:31, 4:1,
  4:13, 5:4,
  8:21, 9:2,
  9:6, 9:8,

13:21, 25:4,
  48:2, 70:9,
  76:14, 98:16,
  98:20, 98:22,
  101:1, 101:7,
  101:35
next 56:8, 63:6
Nicoletti 26:5,
  93:12, 93:14,
  93:15, 94:3,
  94:11, 94:14,
  94:15
Nissan 100:2
No. 1:7, 39:14,
  69:9, 74:19
non-detective
  14:9
non-prostitute
  47:9, 47:13
None 19:14
nor 101:21,
  101:22
Notary 1:29,
  101:6, 101:34
Note 20:18, 71:3
notes 19:18,
  86:16, 87:6,
  101:18
nothing 96:9,
  98:9, 98:10,
  100:13, 101:12
notice 1:25,
  101:14
noticing 4:8
notify 98:3
November 47:21
NUMBER 3:12,
  42:13, 99:5,
  99:7, 99:9,
  99:11
numbers 42:20
NYPD 10:14,
  11:7, 12:17,
  13:3, 54:12,
  55:16, 60:23,
  61:13, 64:3,

66:13, 71:8,
  84:22

< O >
oath 4:4, 5:16
object 60:7
objecting 87:22,
  87:23
objections 4:4
obtain 34:3
occasion 45:17,
  74:20
October 36:8,
  37:3
odd 28:16
oddball 39:15
Offhand 99:15
Office 10:17,
  39:13, 70:8
officer 11:8,
  11:10, 11:12,
  11:14, 14:13,
  14:14, 15:22,
  18:4, 18:14,
  25:21, 33:15,
  60:12, 60:19
OFFICES 2:17
often 38:6
Once 38:4,
  38:12, 41:15,
  73:18, 76:12,
  82:2
One 17:9, 20:1,
  22:9, 23:16,
  23:18, 35:7,
  35:10, 35:11,
  41:13, 42:16,
  48:14, 48:15,
  62:23, 63:16,
  64:13, 67:6,
  67:7, 67:10,
  67:14, 67:16,
  74:8, 78:12,
  80:1, 81:8,
  84:6, 86:8,

88:14, 95:7
ones 32:8
ongoing 69:14
online 26:11,
  26:12, 26:13,
  26:14, 26:19
open 29:20,
  33:16
operations
  25:18, 26:9,
  26:10, 93:11
oral 88:16,
  88:23
outcome 101:23
outside 38:11,
  39:4, 56:22
Overtime 19:2,
  19:4, 19:7,
  19:12
overtures 46:16
own 64:7, 64:9

< P >
P-a-r-i-s-i 25:2
p.m. 1:23,
  100:16
PAGE 3:3, 3:12
paid 35:15,
  36:17, 47:12,
  49:8, 50:11
paper 17:1
papers 19:17,
  30:3, 30:4,
  30:5
Paperwork 29:17,
  29:18, 29:19,
  30:7, 30:8,
  30:10, 30:13,
  30:16, 30:17,
  30:22, 31:3,
  31:20, 31:21,
  35:3, 35:4,
  98:19, 99:1
Parisi 24:23
part 15:8,

27:12, 31:2,
60:22, 64:10,
66:13, 76:10,
78:14
participating
4:2
partner 62:21
Party 5:14,
5:15, 101:22
past 76:21
patrol 16:16,
16:17, 18:4,
18:14, 19:6,
19:12, 51:16,
51:18, 51:19,
51:21, 51:23,
52:3, 52:16,
52:17, 52:19,
52:20, 52:22,
53:3, 94:14
pause 54:7, 87:1
Pawar 2:8, 2:9,
3:5, 3:7, 4:9,
4:22, 83:3,
87:12, 91:4
pawn 26:21
pay 12:12
payment 37:1,
37:4, 37:5,
37:7
pending 6:22,
7:1
People 17:17,
22:14, 71:12,
94:19, 95:4
performance 14:7
period 11:11,
11:13, 22:9,
91:14, 95:9
perp 74:1
person 20:2,
21:4, 21:20,
30:17, 33:17,
39:10, 39:17,
47:13, 50:3,
51:11, 64:13,

64:18, 65:5,
65:18, 71:14,
73:5, 73:6,
73:7, 73:8,
73:10, 73:11,
73:12, 73:14,
74:13, 74:14,
74:15, 94:2,
94:16, 94:20,
97:23
personal 42:16,
97:8, 97:9,
97:10, 99:4,
99:20, 100:5,
100:7
personally 5:5,
51:8, 77:3,
77:10
pertinent 21:17,
22:7
Peter 2:17,
2:18, 4:11,
8:8, 20:15,
60:15, 86:16
petit 26:20
Phone 13:8,
13:9, 21:19,
21:22, 37:16,
37:18, 37:20,
37:22, 39:17,
40:7, 40:8,
41:2, 41:4,
41:7, 42:11,
43:1, 43:2,
75:13, 96:23,
97:5, 97:7,
97:8, 97:9,
97:10, 97:16,
97:21, 99:4,
99:5, 99:9,
99:16, 99:17
phones 40:19,
42:15, 42:17,
97:15, 99:3
physical 43:8
physically 43:10

pick 41:19
piece 31:3
Piquette 95:3
place 27:15,
65:19, 101:14
PLAINTIFF 1:6,
2:6, 4:9, 4:23
plate 63:17,
64:16, 65:8,
65:18, 66:6,
79:12, 80:5,
80:9, 80:22
plates 81:1
Plead 81:22,
82:6, 82:14,
82:21, 83:9,
84:3, 84:12,
84:18
Please 4:6,
25:1, 34:20,
36:19, 36:20,
38:18, 50:14,
50:16, 59:17,
69:7, 71:3,
71:21, 82:11,
82:12, 82:18,
85:11, 86:3,
86:4, 91:17,
92:14, 96:16
PLLC 2:8
plus 21:7, 22:20
point 11:11,
11:17, 24:9,
79:19
police 11:8,
11:10, 11:12,
11:14, 14:13,
15:22, 25:21,
60:12, 60:19,
76:3
policies 31:2
Policy 56:3
pose 86:4
position 14:21,
17:15, 17:20,
18:2

possession 6:10
possible 83:1
Post 9:16, 75:14
Precinct 15:20,
15:22, 18:2,
18:3, 34:12,
34:13, 37:12,
37:14, 38:9,
38:11, 39:4,
39:13, 39:14,
39:15, 39:16,
53:7, 53:8,
63:16, 66:14,
66:16
preparation 9:18
present 31:22
presupposing
91:5
prior 9:11,
16:15, 23:3,
24:10, 24:11,
29:6
privilege 20:19
probably 25:18
probation 56:1
Probationary
11:8, 11:9,
11:11, 11:13,
54:22
problem 7:3,
87:15
problems 23:12
procedure 56:3,
56:4
procedures 61:13
proceedings.
54:7, 87:1
process 35:14
production 75:17
promoted 11:17,
15:17, 16:2,
16:3
proper 6:17,
85:16
property 31:4,
31:11, 81:18,

82:3, 82:10,
83:2
Prospect 39:12
Prostitute 47:9,
47:12, 47:15,
48:22, 49:4,
49:7, 83:22,
84:15
prostitution
48:2
protocol 31:2
provide 35:18
provisions
52:22, 53:2
Public 1:29,
101:6, 101:34
punishment 55:2
purposes 72:3,
72:10
pursuant 1:25,
101:13
put 10:21,
13:21, 54:22,
56:1, 62:16,
63:19, 63:20,
63:21, 65:9,
65:13, 65:17,
66:5, 66:6
putting 63:1

< Q >

quarterly 96:2
Queens 47:18,
48:18
question. 38:20,
50:18, 69:8
questioned 69:18
questioning 83:5
questions 5:3,
56:8, 87:5,
95:13, 96:7,
96:10, 96:22,
98:11

< R >

ran 63:17,
64:15, 65:8,
66:5, 79:12,
80:5, 80:9,
80:22
random 66:5
randomly 65:9,
65:20
rank 11:7
rape 45:20,
87:7, 87:21
RE-EXAMINATION
98:13
reach 70:9
reached 70:2
Read 9:16, 9:17,
16:17, 38:20,
50:18, 51:16,
51:19, 51:21,
51:22, 52:2,
52:4, 53:6,
53:7, 53:9,
53:11, 53:13,
53:15, 60:15,
69:8, 71:22
real 64:5
realize 24:9
reason 12:18,
17:14, 25:8,
39:16, 41:6,
42:9, 42:10
recall 26:8,
38:1, 94:2,
98:7
received 16:14,
30:5, 53:22
recollection
61:9
recommend 83:6
record 4:7,
20:19, 87:13,
87:19
recorded 90:6
records 43:1
refresh 61:8

regarding 5:3,
10:1, 13:21,
20:17, 28:4
regards 70:5
registration
29:19
related 101:22
relations 43:15,
46:5, 47:13,
88:13, 88:15
relationship
25:12, 25:13,
28:13, 35:20,
43:8, 44:7,
46:23, 55:5,
68:3, 79:20,
80:15, 83:22,
84:7, 90:12,
91:1
Relationships
49:10, 49:11
relay 47:23
remain 44:3,
45:4, 45:23,
46:7, 46:18,
47:4, 56:11,
56:18, 57:2,
57:10, 57:18,
58:3, 58:14,
58:21, 59:5,
59:17, 72:13,
82:5, 82:13,
82:20, 83:8,
84:2, 84:11,
87:14, 88:1,
88:7, 88:18,
89:3, 89:10,
89:17, 90:1,
90:14, 91:8
remember 27:15,
27:16, 42:14,
61:2, 61:20,
64:18, 65:3,
65:5, 67:3,
80:5, 87:6,
93:2, 93:6,

94:21, 95:6,
98:21, 99:1
REMOTELY 1:17,
1:30, 4:1, 4:4
repeat 38:17,
38:21, 50:13,
50:15, 69:7,
71:19, 71:21
report 34:15
REPORTED 1:28,
4:1, 50:4
Reporter 38:20,
50:18, 69:8,
71:20, 71:22
reporting 4:5
represent 4:7,
4:22, 8:22,
9:3, 9:6,
98:17, 98:23
represented
98:20
representing 9:9
request 21:15
requested 96:8
required 62:18
resolution 9:1
resources 72:18
respect 52:9,
52:12, 52:15,
52:22, 53:23,
70:10, 81:1,
84:11, 88:13,
95:14
respond 87:13
responded 75:15
response 6:20,
13:5, 13:6,
13:17, 86:3
responsibilities
14:3, 51:1
responsible
32:8, 32:10
restaurant 44:21
return 23:9
review 9:11,
9:20, 9:22,

95:23, 96:1,
96:2, 96:3
reward 33:14
rights 81:21
ripping 17:1
role 12:16
romantic 46:22,
46:23
room 8:13, 57:7
ruling 20:16,
20:20, 64:21,
96:8
run 29:3, 29:13,
81:1
running 29:20,
78:12

< S >

S-h-o-t 33:9
S. 101:6, 101:33
sale 26:20,
95:20
satellite 39:13
saw 36:13, 37:5,
37:13, 73:12,
73:13, 73:17,
73:18, 76:12,
76:17, 77:1,
77:4, 77:11
saying 51:22
says 28:5, 45:10
school 22:20
Scout 53:15
seal 101:27
Second 12:5,
27:9, 62:12,
62:13
seeing 36:15,
77:8
seemed 30:21
seen 10:1, 10:4,
77:10
sent 75:14,
98:19, 99:1
Sergeant 25:2,

94:23, 95:2,
95:3, 95:6,
95:7, 96:4
sergeants 95:8
series 56:8
service 47:18,
49:6
Services 10:17,
84:15
SET 63:13,
63:19, 64:6,
64:10, 65:14,
66:7, 66:8,
66:9, 101:14
sex 45:20, 56:8,
56:15, 56:22,
57:7, 57:16,
57:22, 58:9,
87:7, 87:21,
88:5, 88:16,
88:23, 89:8,
89:15, 91:2
Sexual 43:15,
43:23, 44:7,
45:1, 46:5,
46:16, 49:11,
54:12, 54:15,
54:18, 54:21,
55:4, 68:3,
88:13, 88:15,
89:22, 90:12,
90:23, 91:1
Shatiek 75:22
shaving 61:23,
86:8
she'd 22:8
shield 14:6
shooting 23:5
shootings 22:14
shop 26:21
shorthand 101:18
Shot 33:5, 33:7,
33:8, 33:15
show 37:12, 38:7
showed 38:9,
62:5

shuffle 30:22
sickle 74:21
sign 24:8, 29:4,
29:14, 29:16,
30:1, 30:3,
51:22
signature 30:7
signed 22:4,
23:23, 30:4,
30:5, 48:9
signing 30:12
silent 44:3,
45:4, 45:23,
46:7, 46:18,
47:4, 56:11,
56:18, 57:2,
57:10, 57:18,
58:3, 58:14,
58:21, 59:5,
59:18, 72:13,
82:5, 82:13,
82:20, 83:8,
84:2, 84:11,
87:15, 88:1,
88:8, 88:19,
89:4, 89:11,
89:17, 90:2,
90:15, 91:8
Silverman 8:16
sir 6:19, 7:8,
11:23, 17:3,
42:19, 42:21,
83:17
sit 41:23
situation 84:6
Six 10:20
snitching 28:16
sold 26:21
sole 94:8
solves 33:17
somebody 14:14,
20:12, 24:9,
28:16, 50:1,
53:13, 54:20,
77:8, 85:2,
94:12, 95:20

Someone 20:13,
26:21, 28:17,
34:15, 47:12,
49:16, 53:9
Somewhat 42:3
son 75:21, 76:9,
76:11, 76:12,
76:17, 77:22,
79:14
sorry 7:15, 8:1,
11:6, 29:13,
30:9, 33:7,
33:12, 35:9,
38:5, 38:8,
38:15, 44:16,
69:5, 71:19,
74:5, 91:13
sort 9:1, 16:4,
29:7, 42:4,
46:23, 58:9,
62:9, 79:20,
85:8
speaking 31:22,
31:23
Special 15:9,
15:10, 25:17,
26:9, 26:10,
93:11
specialist 12:4,
12:8, 12:10,
12:16, 13:15,
14:2, 14:6,
14:10, 14:15,
14:19, 14:22,
17:6, 17:10,
18:19, 19:3
speculation
49:18, 85:10
spell 25:1
spoke 22:23,
29:1, 41:15,
73:11, 73:13,
73:17, 76:11
Springfield 2:20
Squad 15:7,
15:8, 18:8,

18:15, 18:22, 19:5, 19:8, 19:22, 30:23, 31:1
ss 101:2
start 10:14, 15:14
started 11:6, 16:7, 16:11, 52:7
starting 4:8
State 98:20, 101:1, 101:7, 101:35
stated 9:2, 17:19, 20:23, 24:14, 27:22, 28:10, 32:18, 47:16, 48:13, 48:14
Staten 10:17, 10:18, 22:21, 75:5
STATES 1:1
stating 4:6, 98:17
Stay 95:12
stayed 18:21
stays 67:14
stenographer 50:15
step 12:5, 12:6
steps 29:16
stole 26:21
stolen 26:20
stop 25:23, 42:11, 62:19
Stoppers 32:10, 32:12, 32:15, 32:16, 32:23, 33:3, 33:19, 34:11, 35:3, 38:14, 38:16, 39:5, 39:7, 39:8, 40:1, 40:7

Strategic 63:13
Street 2:10, 2:30, 40:3, 40:5, 40:6, 76:12, 76:18, 77:8, 77:10, 97:23
stripper 48:14, 49:5
subject 6:3, 6:5
subjected 61:15
subscribed 101:26
substance 37:22
sued 59:22, 60:1, 61:3
suggest 93:20
Suite 2:10
sum 37:22
superior 14:8, 14:14
supervise 85:3
supervised 51:11, 85:7, 91:21, 95:5
supervising 25:23, 92:1, 95:2
supervision 51:14, 54:20, 92:5, 92:7, 92:12, 92:21
supervisor 25:15, 25:17, 25:18, 25:19, 25:20, 26:4, 31:21, 85:3, 85:9, 91:12, 92:23, 93:5, 93:8, 93:11, 93:15, 93:16, 93:17, 93:22, 93:23, 94:9, 94:13, 94:17, 94:21, 94:23, 98:3

supervisors 50:4
supposed 17:21, 31:3, 65:8
supposedly 80:1
SUV 99:23
sworn 4:17, 101:12

< T >
table 19:17
takedown 76:10
Takiesha 1:4, 4:23
talked 92:8
tap 69:1, 69:12, 69:15, 69:16
tape 90:6
target 68:14, 68:17, 68:18, 68:21
Team 63:14, 66:8
terms 14:2, 66:23, 70:16, 71:8
testified 4:18, 5:16, 16:7, 97:22
testify 101:12
testimony 16:14, 49:13, 69:14, 86:10, 93:21, 101:10, 101:11, 101:13, 101:15, 101:17
text 97:2, 97:5, 97:12, 97:19
texted 97:17
THE REPORTER 4:2
themselves 85:18
thereafter 101:15
thereof 101:23
thinking 8:7
Third 11:22,

12:7, 14:1, 14:4, 14:12, 14:17, 15:2, 15:18, 16:3, 37:5, 94:16
threaten 89:21
three 15:1, 15:5, 42:17, 66:20, 95:18
Till 2:17, 2:18, 4:11, 7:9, 7:13, 96:13
title 11:9, 14:18
today 9:8, 9:12, 9:14, 14:21, 90:9
Tonya 27:17, 27:18
took 31:19
touched 43:10, 43:13
touching 91:2
Township 2:20
trailer 58:8
train 54:17
training 16:4, 16:14, 52:9, 52:11, 52:14, 53:22, 95:10
transcribed 101:16
transcription 101:18
transferred 30:15
TRIAL 1:16
trigger 43:19
trouble 50:10
true 13:2, 101:17
truth 101:12, 101:13
truthful 29:8
Try 6:20, 49:19, 77:13

trying 8:21,
  60:8, 94:3
Twice 5:11,
  30:15, 30:21,
  35:8, 76:13,
  82:9, 86:7,
  92:19
Two 5:16, 7:6,
  25:3, 42:16,
  42:17, 66:20,
  67:6, 67:15,
  75:10, 97:15,
  98:11
type 22:13,
  26:9, 29:18,
  51:1, 51:14,
  61:5, 61:9,
  62:18, 68:10
typewriting
  101:16

< U >
UF-250 62:20,
  63:10, 86:11
Um-hmm 44:11
unauthorized
  72:10
undercover
  100:10
undergo 16:3
understand 6:18,
  21:18, 94:15
understanding
  9:5, 17:22,
  48:21, 71:7
understood 6:16
unfortunately
  43:19
union 12:23
unit 7:14, 7:16,
  18:3, 26:22,
  63:13, 64:10,
  65:13, 66:12,
  66:13
UNITED 1:1

unless 96:10
Unmarked 100:11,
  100:12
unshaven 62:5
until 93:8
uses 71:12
using 9:4, 72:2,
  72:9, 82:3,
  82:9, 83:2,
  83:13, 95:20

< V >
vaginal 88:16,
  89:8
vehicle 56:23
verbal 6:20
verbally 52:2,
  92:18
Vesey 2:10
victim 27:18
Vik 2:8, 2:9,
  4:9, 4:22
violence 15:12,
  23:21, 27:4,
  27:7, 27:8,
  27:14, 27:18
Virginia 75:8,
  80:16
voice 68:23,
  69:4, 69:6,
  69:12, 69:14,
  69:16
volunteer 52:5

< W >
W. 2:18
Wait 95:7
waive 4:4
walked 39:22
wanted 12:14,
  18:17, 23:6,
  23:8, 46:12,
  62:4
wants 43:20

warned 62:6,
  62:8, 63:3,
  86:7, 86:10,
  86:13
warrant 32:16,
  32:17, 32:19,
  32:22, 35:14,
  36:18
warrants 30:6,
  32:2, 32:14
Wednesday 1:21
week 38:4, 41:15
welcome 6:23
whatever 8:6
Wheaton 7:4
WHEREOF 101:26
Whereupon 38:20,
  50:18, 69:8,
  71:22, 100:15
whether 43:2,
  58:8, 91:2
whole 101:12
whom 10:8, 79:12
whomever 62:22
Will 4:2, 4:3,
  47:14, 54:5,
  64:6, 86:4
willingly 74:8
wire 69:1,
  69:12, 69:15,
  69:16
withdraw 11:10,
  17:5, 41:9,
  46:22, 72:19,
  90:10, 90:18,
  90:19
within 22:9,
  30:15, 100:4
without 14:15,
  60:7
WITNESS 3:3,
  6:3, 6:5,
  27:7, 27:11,
  64:19, 86:4,
  94:1, 101:10,
  101:26

woman 76:4,
  83:22, 84:7
word 16:10,
  53:15
work 11:4, 14:5,
  14:6, 20:9,
  21:20, 42:16,
  49:8, 49:9,
  68:6, 68:7,
  85:3, 85:7
worked 20:8,
  22:4, 47:18,
  48:15, 49:6,
  66:12
working 10:14,
  18:8, 22:2,
  26:6, 50:1,
  52:7, 60:23,
  84:22, 85:1
worry 96:6
worse 67:10,
  67:15
writing 13:8,
  13:21, 98:16

< Y >
year 11:20,
  12:9, 26:2,
  30:19, 54:22,
  54:23, 60:4,
  62:1, 63:7,
  66:19, 74:2,
  96:5
years 7:6,
  10:19, 10:20,
  15:1, 15:6,
  21:4, 21:5,
  22:20, 25:16,
  25:18, 26:22,
  42:17, 66:20,
  66:21, 67:6,
  67:15, 73:12,
  76:21, 85:1
Yolanda 75:4
York 1:2, 1:8,

1:18, 1:30,
2:11, 2:24,
2:26, 2:31,
4:1, 4:13,
5:5, 8:21,
9:2, 9:6, 9:8,
48:3, 70:9,
76:14, 98:16,
98:20, 98:22,
101:1, 101:7,
101:35
young 80:13,
80:15
yourself 5:5,
10:9, 74:9

< Z >
zoned 71:20