# EXHIBIT 6



**POLICE DEPARTMENT**

```
------------------------------------------------------------------x
  In the Matter of the Disciplinary Proceedings        :

                    - against -                         :      FINAL

         Police Officer Brooks Ingram                   :      ORDER

         Tax Registry No. 963077                        :      OF

         Police Service Area 2                          :      DISMISSAL
------------------------------------------------------------------x
```

     Police Officer Brooks Ingram, Tax Registry No. 963077, having been served with written notice, has been tried on written Charges and Specifications numbered 2023-28896 (PODS Case C-031580), as set forth on form P.D. 468-121, dated May 23, 2024 and amended on the record on September 18, 2025. After a review of the entire record, Respondent is found Guilty of Specifications 1, 2 and 4, and having pleaded Guilty, is found Guilty of Specifications 3, 5, 6, 7, 8, 9, 10, 11, 12 and 13.

     Now therefore, pursuant to the powers vested in me by Section 14-115 of the Administrative Code of the City of New York, I hereby DISMISS Police Officer Brooks Ingram from the Police Service of the City of New York.

HONORABLE JESSICA S. TISCH
POLICE COMMISSIONER

EFFECTIVE: 11/21/25

COURTESY • PROFESSIONALISM • RESPECT
Website: http://nyc.gov/nypd

PD 158-151 (Rev 12-07)



POLICE DEPARTMENT

October 30, 2025

----------------------------------------------------------------------x

| In the Matter of the Charges and Specifications | : | Case No. |
|---|---|---|
| - against - | : | C-031580 |
| Police Officer Brooks Ingram | : | |
| Tax Registry No. 963077 | : | |
| Police Service Area 2 | : | |

----------------------------------------------------------------------x

At:                Police Headquarters
One Police Plaza
New York, NY 10038

Before:       Honorable Anne E. Stone
Assistant Deputy Commissioner Trials

APPEARANCES:

For the Department:      Matthew McCarthy, Esq.
Department Advocate's Office
One Police Plaza, Room 402
New York, NY 10038

For the Respondent:      Roger Blank, Esq.
2201 Baxter Lane, Ste. 10295
Bozeman, MT 59718-9998

To:

HONORABLE JESSICA S. TISCH
POLICE COMMISSIONER
ONE POLICE PLAZA
NEW YORK, NY 10038

COURTESY • PROFESSIONALISM • RESPECT
**Website: http://nyc.gov/nypd**

PD 168-151 (Rev. 12-07)

# CHARGES AND SPECIFICATIONS

1. Said Probationary Detective[1] Brooks Ingram, while assigned to the 120 Precinct Detective Squad, on or about June 9, 2023, did intentionally make a false statement during an official Department interview in that, said Probationary Detective stated he had not had contact with ▮▮▮ K.S. ▮▮▮ in over a year, when in fact he had contact with her in February 2023.

    A.G. 318-11                                    INTERROGATION OF
                                                   MEMBERS OF
                                                   THE SERVICE

    A.G. 304-10, Page 1                            FALSE OR MISLEADING
                                                   STATEMENTS

2. Said Probationary Detective Brooks Ingram, while assigned to the 120 Precinct Detective Squad, on or about June 9, 2023, did intentionally make a misleading statement during an official Department interview in that, said Probationary Detective denied ever having a sexual or romantic relationship with ▮K.S.▮▮▮.

    A.G. 318-11                                    INTERROGATION OF
                                                   MEMBERS OF
                                                   THE SERVICE

    A.G. 304-10, Page 1                            FALSE OR MISLEADING
                                                   STATEMENTS

3. Said Probationary Detective Brooks Ingram, while assigned to the 120 Precinct Detective Squad, on or about June 9, 2023, impeded an investigation, in that, during an official Department interview, when asked for his personal cellular telephone number, said Probationary Detective provided a cellular telephone number that had been deactivated on March 10, 2023.

    A.G. 318-11                                    INTERROGATION OF
                                                   MEMBERS OF
                                                   THE SERVICE

    A.G. 304-10, Page 1                            FALSE OR MISLEADING
                                                   STATEMENTS

4. Said Probationary Detective Brooks Ingram, while assigned to the 120 Precinct Detective Squad, on or about and between September 2021 and October 2023, knowingly

---

[1] Respondent was a probationary detective at the time of the incident. He was demoted to the rank of Police Officer in December 2024.

associated with individuals that he reasonably believed were engaged in, or were likely to engage in criminal activities, or had previously engaged in criminal activities.

A.G. 304-06, Page 2, Paragraph 8(c)                         PROHIBITED CONDUCT

5. Said Probationary Detective Brooks Ingram, while assigned to the 120 Precinct Detective Squad, on or about and between September 2021 and October 2023, engaged in conduct prejudicial to the good order, efficiency or discipline of the Department in that, he knowingly engaged in a relationship beyond the scope of official duties with witnesses or victims while on or off duty.

A.G. 304-06, Page 2, Paragraph 7                            PROHIBITED CONDUCT

6. Said Probationary Detective Brooks Ingram, while assigned to the 120 Precinct Detective Squad, on or about September 17, 2023, engaged in conduct prejudicial to the good order, efficiency or discipline of the Department in that, said Probationary Detective operated his personal motor vehicle, a 2021 white Dodge Ram pickup truck, without license plates, resulting in evading payment of tolls on the Verrazano Bridge both eastbound and westbound. *(As amended)*

A.G. 304-06, Page 1, Paragraph 1                            PROHIBITED CONDUCT

7. Said Probationary Detective Brooks Ingram, while assigned to the 120 Precinct Detective Squad, on or about March 21, 2023, failed to make proper notifications to a supervisor when he was accused of misconduct by a complainant, M.E. ████████

A.G. 304-06, Page 1, Paragraph 1                            PROHIBITED CONDUCT

P.G. 207-21, Page 2, Additional Data                        ALLEGATIONS OF
                                                            MISCONDUCT AGAINST
                                                            MEMBERS OF THE
                                                            SERVICE

8. Said Probationary Detective Brooks Ingram, while assigned to the 120 Precinct Detective Squad, on or about and between November 2022 and January 2024, failed to update his address in the Centralized Personnel Resource System when he moved to ████████████ ████████, within the confines of 120 Precinct.

A.G. 304-25, Page 1, Paragraph 4                            RESIDENCE
                                                            REQUIREMENTS

A.G. 304-16, Page 1, Paragraph 1                            PERSONAL
                                                            INFORMATION VIA
                                                            DEPARTMENT NTRANET

9. Said Probationary Detective Brooks Ingram, while assigned to the 120 Precinct Detective Squad, on or about and between November 2022 and November 2023, engaged in

conduct prejudicial to the good order, efficiency or discipline of the Department in that, said Probationary Detective wrongfully resided within the confines of the 120 Precinct, the precinct where he worked.

| | |
|---|---|
| A.G. 304-06, Page 1, Paragraph 1 | PROHIBITED CONDUCT |
| A.G. 304-25, Page 1, Paragraph 7 | RESIDENCE REQUIREMENTS |

10. Said Probationary Detective Brooks Ingram, while assigned to the 120 Precinct Detective Squad, on or about and between November 2022 and August 2023, utilizing Department Computer Systems wrongfully conducted inquiries on twenty (20) occasions for reasons unrelated to official Department business.

| | |
|---|---|
| P.G. 219-14, Page 1, Paragraph 2 | DEPARTMENT |
| P.G. 219-14, Page 2, Additional Data | COMPUTER SYSTEMS |
| P.G. 219-32, Page 1, Paragraph 1 | DEPARTMENT MOBILE DIGITAL DEVICES |

11. Said Probationary Detective Brooks Ingram, while assigned to the 120 Precinct Detective Squad, on or about and between November 2022 and August 2023, wrongfully conducted numerous inquiries utilizing Department Computer Systems unrelated to official Department business and divulged the results of those queries.

| | |
|---|---|
| P.G. 219-14, Page 1, Paragraph 2 | DEPARTMENT COMPUTER SYSTEMS |
| A.G. 304-15, Page 1, Paragraphs 1, 3, 4, 5 | DEPARTMENT CONFIDENTIALITY POLICY |
| A.G. 304-06, Page 1, Paragraph 1 | PROHIBITED CONDUCT |

12. Said Probationary Detective Brooks Ingram, while assigned to the Manhattan Court Section, on or about December 15, 2023, while on sick report and modified, left his residence or authorized location without permission of the Department Surgeon or Sick Desk supervisor.

| | |
|---|---|
| A.G. 330-01, Page 1, Paragraph 4(b) | REGULAR SICK |

13. Said Probationary Detective Brooks Ingram, while assigned to the 120 Precinct Detective Squad, on or about and between August 2023 and October 2023, engaged in conduct prejudicial to the good order, efficiency or discipline of the Department in that, said Probationary Detective operated his personal motor vehicle, a 2021 white Dodge Ram pickup truck, without license plates, in a reckless, erratic, and unsafe manner.

A.G. 304-06, Page 1, Paragraph 1                    PROHIBITED CONDUCT

NY VTL § 1212                                       RECKLESS DRIVING


## REPORT AND RECOMMENDATION

The above-named member of the Department appeared before me on September 18, 2025. Respondent, through his counsel, entered a plea of Not Guilty to Specifications 1, 2, and 4 and pled Guilty to the remaining charges. The Department called Lieutenant Freddy Cantillo to the stand. Respondent testified on his own behalf. A stenographic transcript of the trial record has been prepared and is available for the Police Commissioner's review. Having evaluated all of the evidence in this matter, I find Respondent Guilty of Specifications 1, 2, and 4, and in accordance with his plea, Guilty of the remaining Specifications. I recommend that Respondent be DISMISSED from the New York City Police Department.


## ANALYSIS

These charges stem from an Internal Affairs Bureau ("IAB") probe of a series of allegedly improper personal relationships Respondent had with five women. Three had criminal histories and two were witnesses in cases he investigated. He engaged in these inappropriate relationships between September 2021 and June 2023 while assigned to the 120 Precinct Detective Squad. In the course of investigating these relationships, as outlined below, IAB uncovered other acts of misconduct including computer misuse, violations of residency rules, and failure to make proper notifications. At trial, Respondent pled Guilty to ten specifications and Not Guilty to making false official statements, making misleading statements, and criminal association. The facts in this matter are largely undisputed.

*Specification 1: False Statement*

*Specification 2: Misleading Statement*

*Specification 3: Impeding an Investigation[2]*

*Specification 4: Criminal Association*

In January of 2023, a call was made to the IAB Command Center from a member of the 120 Precinct Detective Squad ("120 Squad"). The caller was debriefing a young woman, ▮▮▮▮ ▮▮▮▮ ("B.S."), who had been arrested. She pointed at Respondent as he walked past and stated that Respondent was in a relationship with her mother, ▮▮▮▮▮▮ ("K.S."),[3] and that he "did things for her." An investigation was commenced, which revealed that Respondent was involved in a sexual relationship with K.S. starting when he pulled her over in 2017 or 2018. There is no dispute that K.S. was arrested several times between 2018 and April 2023, and that she provided Respondent with information about criminal activity being committed by other people. However, the parties disagree about when the romantic relationship concluded and whether Respondent was aware of her criminal history while they were involved with one another.

Respondent was interviewed by IAB under the provisions of Administrative Guide 318-11 on June 9, 2023. When asked about the nature of his relationship with K.S., Respondent initially responded that it was "professional" and that she simply provided him with information about crimes occurring in his command. After a break to confer with his union representative and some further questions, Respondent admitted that he also had a sexual relationship with K.S. but contended that it had ended a couple of years prior. According to Respondent, aside from seeing her driving a few weeks before the interrogation, he had not had any contact with K.S. for "at

---

[2] Respondent pled Guilty to Specification 3 (impeding an investigation); however, because it involves his Department interview, the tribunal will address that specification in this section.

[3] There are five individuals with whom Respondent is alleged to have had improper relationships, as well as two other individuals relevant to the events. None of these people appeared before the tribunal. They will be referred to by their initials throughout the decision.

least a year." (Tr. 41-53; Dept. Exs. 1 and 1A, audio recording and transcripts of Respondent's A.G. hearing)

On February 11, 2022, ███████ ("K.P.") was arrested by Respondent for Aggravated Harassment. Respondent has known "K.P." since childhood, when they lived on the same street. While processing the arrest, Respondent never informed his supervisor that he knew K.P. Sometime after Respondent arrested K.P., they "saw each other" and had a "sexual" relationship. Respondent's phone records show that after that arrest the two called and texted one another in January of 2023. (Tr. 50-52, 210-11; Dept. Ex. 4, Respondent's phone records)

On December 26, 2022, Respondent arrested ███████ ("D.D.") for a domestic assault. Respondent knew D.D. in high school when they were in many classes together. After the arrest, from June 15, 2023 to July 5, 2023, Respondent called D.D. 24 times and received 33 text messages from her. In addition, Respondent ran computer checks in regard to a case in the Bronx where D.D. was a victim and then relayed information about it to her. (Tr. 55-56, 208; Dept. Ex. 4)

Lieutenant Freddy Cantillo testified that in January 2023, when he was a Sergeant in IAB, he was assigned to investigate Respondent's relationship with K.S. He recalled interviewing her daughter, B.S., who claimed that Respondent was her mother's boyfriend and that she had seen them together recently. According to Lieutenant Cantillo, her daughter also told him that she had been present when K.S. had gotten a tattoo for "her boyfriend, King Brooks." Lieutenant Cantillo stated that in an interview with B.S.'s aunt, she confirmed the significance of K.S.'s tattoo, as well as the intimate nature of her relationship with Respondent. (Tr. 41-43, 77, 119)

Lieutenant Cantillo detailed that he subpoenaed Respondent's phone records and compared the contacts with the audit of his DAS searches. The records revealed that he had phone contact with K.S. until at least February 2023 and had run her name in DAS multiple times. In addition, he explained that on April 6, 2023, K.S. posted two images on her public Facebook page. The first image was of a tattoo with Respondent's first name and a king chess piece. Lieutenant Cantillo recounted that he had learned that Respondent 's nickname in high school was "King." The second image was of K.S. embracing a man who was facing away from the camera in a store. Lieutenant Cantillo admitted that he was unable to verify whether the man was Respondent, but the man in the photo had a similar build to him. (Tr. 79-81, 116-120, Dept. Exs. 6 and 7, photographs)

Lieutenant Cantillo testified about the official Department interview of Respondent on June 9, 2023. Lieutenant Cantillo recalled that after initially describing his relationship with K.S. as "professional," Respondent admitted he had engaged in an intimate relationship with her. He remembered Respondent claiming that the two had not had any contact in over a year. (Tr. 72-73, 92-93, 110-11, 120)

In addition, Lieutenant Cantillo detailed that the investigation revealed Respondent's personal relationships with K.P .,and D.D. He explained that Respondent not only contacted them, he also queried them through DAS. Lieutenant Cantillo recounted that Respondent was "unable to provide a legitimate Department reason for these inquiries." (Tr. 55, 59, 105-06)

Lieutenant Cantillo explained that once an officer arrests an individual, a relationship with that individual is "absolutely not" permissible, reasoning that it "would fall under the purview of criminal association." (Tr. 56) He expounded, "[o]nce the case is over, there's really no reason to continue a relationship outside of the case. Especially when it's a criminal matter.

Goes to court. There's no legitimate reason to continue a personal relationship with the complainants or witnesses or arrestees." (Tr. 53)

Respondent took the stand and recounted his professional life, which included active duty service in the Army and work as a paraprofessional with the Department of Education prior to joining the NYPD. He recounted pulling K.S. over for a traffic infraction, discovering her driver's license was suspended, and deciding not to arrest her because there were children in the car. Respondent alleged that, during the car stop, K.S. volunteered that she knew criminal "players" in the area and was willing to give him information about them. Respondent acknowledged that after this interaction, he and K.S. had an intimate relationship. (Tr. 142-46, 151)

Respondent was asked why he initially denied the nature of their relationship during his official interview on June 9, 2023. He testified that he was "embarrassed" to admit his involvement with K.S. in front the D.E.A. delegates, because their children played sports on the same team. After requesting a break in the interview and speaking with his lawyer, Respondent asserted that he came back into the room and admitted "everything." According to Respondent, he volunteered that the relationship was personal before the investigators offered him the chance to amend his previous statement. During cross-examination, Respondent maintained that although he ran K.S. through DAS several times during their relationship, he simply accessed her driving record to have leverage over her so that she would continue giving him information on criminal activity. Respondent claimed that he was unaware that she had been arrested for 14 felonies and 14 misdemeanors until he was informed of them by IAB investigators during his official interview. (Tr. 143-46, 151-52, 234-35, 238-39)

Lieutenant Cantillo testified in a detailed, credible manner that IAB, having become aware of an allegation of criminal association against Respondent, conducted a thorough investigation which uncovered not only Respondent's relationship with K.S., but also with K.P. and D.D. His testimony was consistent with Respondent's phone records and audits of his DAS usage. (*See* Dept. Exs. 3A-3D, 4) Lieutenant Cantillo described interviewing K.S.'s daughter and her daughter's aunt, who both confirmed having seen Respondent and K.S. together in 2023, including observing the tribute tattoo K.S. had on her arm.

Administrative Guide 304-10 prohibits members of service from making false or misleading statements in the course of an official Department interview. It defines a false statement as "an intentional statement that a member of the service knows to be untrue, which is material to the outcome of an investigation, proceeding, or other matter in connection with which the statement is made." A misleading statement is "one that is intended to misdirect the fact finder and materially alter the narrative by intentionally omitting a material fact or facts."

Respondent admits that he initially told IAB interviewers on June 9, 2023, that he and K.S. had only a professional relationship. He argues that in the course of the same interview, he voluntarily corrected that characterization of the relationship and therefore should be found not guilty. I disagree. I listened carefully to Respondent's interview. When asked, "[a]re you in a sexual relationship with [K.S.]," Respondent unequivocally denied having any personal, much less intimate, relationship with her at least five times. The nature of Respondent's relationship with this individual is a material fact; if indeed, the relationship was completely professional, then no misconduct would have occurred. While on the stand, Respondent contended that after the break in the interview, he immediately retracted those statements without being prompted. The recording of the interview, however, directly contradicts that testimony. Respondent

continued to refer to K.S. as an informant until Lieutenant Cantillo pressed, "[s]o let's just get in, let's just stop beating around the bush. What is your personal relationship with [K.S.]? Currently, previous. Okay. And then we'll go currently." Respondent then reluctantly replied, "Previously, previously I had an intimate relationship with [K.S.]" (Dept. Ex. 1A at 15-19)

Respondent then continued to try to minimize the relationship by telling investigators that the sexual relationship with K.S. had been over for several years, with no contact between the parties at all for a year. Respondent argues that telling the interviewers that he saw K.S. driving in the weeks leading up to the interrogation constituted a correction of his earlier statement about no contact. It is clear to the tribunal that the interviewers were referring to a more fulsome interaction than merely driving past someone. In addition, Respondent did not volunteer this information, he supplied it only after being asked when the last time he "physically saw" K.S. was. In any event, the Department has provided ample evidence that Respondent and K.S. were still communicating and involved with one another well beyond June 2022, until at least February 2023. Police Officers are obliged to be forthcoming and truthful during official interviews, in order to assist the Department in their investigation of misconduct. In an attempt to minimize his culpability, Respondent first misled investigators about the nature of his relationship with K.S. and then lied about when it ended. For the foregoing reasons I find Respondent Guilty of Specifications 1 and 2.

At trial, Respondent pled guilty to Specification 3, impeding an investigation. He admitted that during the same June 2023 official interview, when asked for his current cell phone number, Respondent provided a number with a "347" area code, which had been deactivated in March 2023. He did not provide his current number until a subsequent interview in January 2024. In accordance with his plea, I find him guilty of Specification 3.

Regarding Specification 4, I find that the Department has proven by a preponderance of the credible evidence that Respondent knowingly associated with three individuals who he reasonably believed had been, were, or were likely to engage in criminal activities. Respondent admitted to running K.S.'s name in DAS during the course of their relationship. However, Respondent expects this tribunal to believe that he limited his review to her driving record and did not look at her criminal history. It is not believable that a member of the NYPD, who is already committing misconduct by making unauthorized computer inquiries about his romantic partner, would hesitate to gather as much information as possible about her, in particular her criminal history. With regards to the other two women, although he denied any romantic relationship with D.D., Respondent stayed in contact with her after arresting her, including sharing information with her about another case. In addition, Respondent admitted that sometime after he arrested K.P., he was intimate with her and was in contact with her via cellphone. Accordingly, I find him Guilty of Specification 4.

Uncontested Specifications

At trial, Respondent pled Guilty to ten Specifications and testified in mitigation of penalty. In addition to Specification 3 addressed above, in accordance with his pleas and for the reasons listed below, I find him guilty of Specifications 5, 6, 7, 8, 9, 10, 11, 12 and 13.

*Specification 5: Inappropriate Relationships*

On September 15, 2021, Respondent was assigned to investigate a robbery which was witnessed by ▮▮▮▮▮▮▮▮. ("L.R.") Respondent knew L.R. because she lived five minutes away from his church and the two had mutual acquaintances. L.R. identified the culprits and on September 23, 2021, Respondent closed the case with two arrests. In the spring of 2022, Respondent and L.R. began to socialize with one another including an incident when Respondent

went to her residence, off duty. During an interview with IAB, L.R. alleged that Respondent was intoxicated and attempted to kiss her, which she rebuffed. At trial, Respondent admitted going to L.R.'s home, but denied trying to kiss her. From August 11, 2022 until February 3, 2023, Respondent and L.R. exchanged 34 phone calls and 153 text messages. (Tr. 158-60, 204-05; *see* Dept. Ex. 4)

On December 2, 2022, ███████ ("A.G."), the managing agent for the Park Hill Houses, witnessed and reported an instance of criminal mischief in the apartment complex. After Respondent was assigned to the case, the two became friends. Respondent gave her both his personal and Department cell phone numbers. After he closed the initial criminal mischief case on January 10, 2023, Respondent and A.G. exchanged 65 phone calls and 3,242 text messages. Respondent admitted that he took advantage of the relationship to gain easy access to the Park Hill Houses and quickly retrieve surveillance footage. In return, Respondent became a primary point of contact for A.G. in the Precinct and helped her get information quickly with regard to crimes which had occurred there. (Tr. 160-62, 197-98, 200-03; *see* Dept. Ex. 4)

*Specification 7: Failure to Notify*

On March 21, 2023, Respondent was off duty at home when he received a phone call from the 120 Precinct telephone switchboard operator. The operator informed him that ███████ ███████ ("M.E.") was present at the 120 Precinct seeking to file a complaint against him for misconduct. On an earlier date, M.E. reported to the NYPD that K.S. had attempted to hit her with her car. While present at the precinct on March 21, 2023, M.E. alleged that she had been told that K.S.'s "boyfriend," whom she identified as Respondent, was using his position as a police officer to prevent K.S. from being arrested. Respondent spoke with M.E. over the phone, denied the accusation, and told her to call IAB. Respondent did not notify his sergeant, or any

superior officers, nor did he report the accusation to IAB. He testified that he did not take her threat seriously and was unaware that he had to notify a sergeant on his day off. (Tr. 124-25, 176-177, 240)

> *Specifications 10 and 11: Computer Misuse/Divulging Information*

An audit was conducted of Respondent's use of the NYPD's Domain Awareness System ("DAS"). It revealed that between November 2022 and August 2023, Respondent conducted twenty inquiries that were unrelated to official Department business. These included running the names of the five women he is accused of having inappropriate relationships with. He also made inquiries about the above-mentioned case in which D.D. was the victim. Respondent admitted to making the inquiries, but contended that most were made to check the driving records of individuals who had requested Detectives' Endowment Association cards from him. Respondent testified that while his brother was applying for employment as a police officer, he also ran his name through the database and informed him that he had summonses. (Tr. 43-58, 162-72; Dept. Ex. 3A-3D Respondent's DAS Audit)

> *Specification 6: Operating Vehicle Without License Plate*
> *Specification 13: Reckless Driving*

During the investigation into Respondent's relationships, officers from IAB conducted surveillance between August 2023 and October 2023. They observed and recorded Respondent driving his personal vehicle, which did not have license plates, through red lights, cutting people off, and swerving in and out of HOV lanes. In addition, on September 17, 2023, Respondent drove over the Verrazano Bridge, with no license plate and no EZ pass, evading the toll. He testified that there had been a problem with the car dealership registering the truck and then blamed the continued registration lapse on "just being completely lazy." (Tr. 60-61, 66-69, 172-76; *see* Dept. Exs. 5A-5G, video surveillance of Respondent driving)

*Specification 12: Out of Residence on Sick Report*

*Specifications 8 and 9: Residency Requirements/Failure to Update Address*

On December 15, 2023, while on modified duty, Respondent called in sick. Members of the NYPD were sent to the address listed in his Centralized Personnel Record, but Respondent was not present. Respondent, who had only ever reported sick on one other occasion, contended that he was unaware that members of the service on modified assignment are not permitted to leave their residence while on sick leave without permission from the Medical Division. (Tr. 63-65, 184-87)

As a result of this incident, the Department became aware that sometime after November 2022, Respondent moved and failed to notify the Department of his new address until January 2024. In addition, the new apartment was located within the confines of the 120 Precinct, and he lived there while he was working in the 120 Squad. Respondent alleged that he was unaware that personnel assigned to Detective squads were not allowed to reside in the precinct where they worked. He claimed that his failure to inform the Department of his new address was based on laziness, rather than an attempt to conceal his violation of Department policy. (Tr. 61-63, 178-81, 195-96)

## PENALTY

In order to determine an appropriate penalty, this Tribunal, guided by the Department's Disciplinary System Penalty Guidelines, considered all relevant facts and circumstances, including potential aggravating and mitigating factors established in the record. Respondent's employment history was also examined. *See* 38 RCNY § 15-07. Information from his personnel record that was considered in making this penalty recommendation is contained in an attached memorandum.

Respondent, who was appointed to the Department on January 4, 2017, has been found Guilty of Specifications 1, 2, and 4, making false and misleading statements, and criminal association. Additionally, in accordance with his plea, he is also found Guilty of Specifications 3, 5, 6, 7, 8, 9, 10, 11, 12, and 13. The Department Advocate has recommended that Respondent be dismissed from the NYPD. Counsel for Respondent has argued for a penalty that would allow Respondent to continue working for the Department.

The presumptive penalty for Specification 1, Making a False Official Statement, is termination. The combined presumptive penalties for the other twelve specifications would be the forfeiture of over 200 penalty days and the imposition of one year of Dismissal Probation.[4] As set forth in the Disciplinary Matrix, "in the event that the total number of penalty days is calculated at greater than 90 days, the presumed penalty shall be termination or forced separation." (Disciplinary Matrix, p. 13) For the reasons set forth below, I find that there are no facts which warrant mitigation, and I recommend that Respondent's employment be terminated.

In the matter at hand, Respondent committed serious misconduct when he engaged in improper relationships with five women. Three of the women he knew had been involved in criminal activity and two others were witnesses to crimes he investigated. In the course of investigating this misconduct, it came to light that he had conducted searches for each of these

---

[4] The presumptive penalties for each specification are as follows: Intentionally Making a Misleading Official Statement- 30 penalty days and dismissal probation (Disciplinary Matrix, p. 34); Impeding an Investigation- 30 penalty days and dismissal probation (Disciplinary Matrix, p. 34); Criminal Association- 20 penalty days (Disciplinary Matrix, p. 46); Engaging in a Relationship Beyond the Scope of Official Duties-20 penalty days (Disciplinary Matrix, p. 46); Conduct Prejudicial to the Good Order of the Dept.- N/A, ranges from training to termination (Disciplinary Matrix, p.46); Failure to Report Misconduct to IAB- 10 penalty days (Disciplinary Matrix, p.47); Failure to Notify Department of Address Change- Schedule "A" Command Discipline with a penalty of up to 5 days (Disciplinary Matrix, p. 52); Computer Misuse- 10 penalty days (Disciplinary Matrix, p. 47); Computer Misuse with Dissemination of Information- Schedule "C" Command Discipline with a penalty of up to 20 days (Disciplinary Matrix, p. 55); Failure to Comply with Driving Rules and Regulations- Schedule "A" Command Discipline with a penalty of up to 5 days (Disciplinary Matrix, p. 52); Out of Residence While on Sick Leave -10 penalty days. (Disciplinary Matrix, p.47)

women, as well as other individuals through the DAS database. These searches were unrelated to Department business and in some cases the information obtained was improperly divulged. He also broke several Departmental rules regarding his residency and personal vehicles. Compounding these underlying acts of misconduct, when interviewed by IAB, Respondent lied to investigators about the nature and duration of his relationship with K.S. and provided them with a cellphone number he knew had been disconnected three months prior.

Respondent's explanations for the improper relationships seem to be primarily that most were with women he had known before he started working for the NYPD. The tribunal acknowledges that all members of the NYPD had friendships which preceded their employment. However, Administrative Guide 304-06 makes clear that personal relationships with individuals who have committed crimes or were witnesses to crimes are improper. Respondent took no steps to avoid these entanglements and indeed appeared to view his work as an opportunity to meet potential dates. His casual attitude towards NYPD rules and regulations, as well as New York State Vehicle and Traffic Laws, was apparent in his responses that he was "lazy" about updating his address and properly registering his car. This lack of concern extended to his belief that because he was off duty, he was not required to notify the Department that an accusation of serious misconduct had been leveled against him.

Respondent pled guilty to ten of the thirteen specifications in this matter and acknowledged that his actions violated the rules of the Department. Although he claimed to be accepting responsibility, even on the stand, it was clear from his responses and his demeanor that Respondent appeared to think some of the rules were trivial and did not seem to appreciate the gravity and the breadth of the misconduct he committed.

<u>POLICE OFFICER BROOKS INGRAM</u>                                                      18

     The Department and the public must be able to trust that our police officers will not take advantage of their positions of power in order to advance their social lives. There is also a fundamental expectation that members of service will not engage in willful deceit or behave in an intentionally dishonest manner. Respondent has wholly betrayed that trust, thereby rendering his continued employment as a police officer untenable. His conduct and attempts to manipulate the truth illustrate a stunning lack of judgment and have irretrievably compromised his ability to remain entrusted with the responsibilities of a member of service. Therefore, based upon the totality of the circumstances, the seriousness of the misconduct to which Respondent has admitted, and the evidence submitted in this case, I recommend that the Respondent be DISMISSED from the New York City Police Department.

Respectfully submitted,

Anne E. Stone
Assistant Deputy Commissioner Trials

APPROVED

NOV 2 1 2025

JESSICA S. TISCH
POLICE COMMISSIONER



### POLICE DEPARTMENT CITY OF NEW YORK

From:          Assistant Deputy Commissioner – Trials

To:            Police Commissioner

Subject:       SUMMARY OF EMPLOYMENT RECORD
               POLICE OFFICER BROOKS INGRAM
               TAX REGISTRY NO. 963077
               DISCIPLINARY CASE NO. C-031580

Respondent was appointed to the Department on January 4, 2017. On his most recent annual performance evaluations, he was rated "Exceeds Expectations" for 2023, and received 4.5 ratings of "Extremely Competent/Highly Competent" in 2021, 2022 and 2023. He has been awarded two medals for Meritorious Police Duty.

Respondent has no formal disciplinary history. In connection with the instant matter, he was suspended without pay from June 14, 2024 through July 14, 2024. He was placed on Level 2 Discipline Monitoring in March 2025; monitoring remains ongoing.

For your consideration.

Anne E. Stone
Assistant Deputy Commissioner Trials